**UNITED STATES of America,**

**v.**

**Richard MASTRANGELO, Defendant.**

**No. 80 CR 285 (S-1).**

United States District Court,
E.D. New York.

April 15, 1983.

murder of the principal witness against him. The Court of Appeals instructed that:

> If the District Court finds that Mastrangelo was in fact involved in the death of Bennett through knowledge, complicity, planning or in any other way, it must hold his objections to the use of Bennett's testimony waived. Bare knowledge of a plot to kill Bennett and a failure to give warning to appropriate authorities is sufficient to constitute a waiver.

*United States v. Mastrangelo,* 693 F.2d 269, 273–74 (2d Cir.1982). The Court of Appeals directed that evidence of Mastrangelo's complicity in the murder of Bennett should be evaluated under the "preponderance of the evidence" standard of proof, as well as the "clear and convincing evidence" standard in order to expedite further proceedings. *Id.*

Pursuant to the Court of Appeals' mandate, an evidentiary hearing was held before this Court beginning December 20, 1982 and continuing through December 23, 1982. The evidence included, *inter alia,* (a) the testimony of Joseph Bennett (the nephew of the murdered witness James Bennett), Nicholas Berardi, and Assistant United States Attorney Walter Mack; (b) the prior grand jury testimony and other written statements of Joseph Bennett and Nicholas Berardi, and (c) the prior proceedings and exhibits in the case, including a February 1, 1979 tape-recorded conversation between Mastrangelo and James Bennett.

Based upon this evidence, as discussed below, I find that the Government has established by a preponderance of credible evidence that Mastrangelo had prior knowledge of a plot to murder James Bennett and failed to warn the appropriate authorities. I find, however, that the Government has not established Mastrangelo's prior knowledge of the murder plot by "clear and convincing" evidence.

Additionally, for the reasons developed below, the motion filed by Mastrangelo at the conclusion of the evidentiary hearing for an order, pursuant to Fed.R.Cr.P. 33, granting him a new trial is denied.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. (William J. Muller, Asst. U.S. Atty. Brooklyn, N.Y., of counsel), for the U.S.; L. Kevin Sheridan, Asst. U.S. Atty., Brooklyn, N.Y., on brief.

Gerald L. Shargel and Michael Coiro, New York City, of counsel, for defendant; Judd Burstein, New York City, on brief.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

On April 27, 1982 defendant, Richard Mastrangelo, was convicted of conspiracy to possess, with intent to distribute, controlled substances, importation of controlled substances and obstruction of justice. As a result of this conviction, Mastrangelo was sentenced to a total of nine years imprisonment and was fined $20,000.00. In addition, a special parole term of ten years was imposed.

On appeal, Mastrangelo sought reversal of his conviction on the ground that this Court had improperly admitted into evidence the grand jury testimony of James Bennett, a government witness who was murdered on the morning he was scheduled to testify at Mastrangelo's first trial before Chief Judge Weinstein.

The United States Court of Appeals for the Second Circuit remanded the case for an evidentiary hearing on the issue of whether Mastrangelo effectively waived his rights under the confrontation clause of the sixth amendment through complicity in the

## THE EVIDENTIARY HEARING

### 1. JOSEPH BENNETT

The Government's first witness was Joseph Bennett, a participant in the federal witness protection program with a substantial criminal record. Transcript ("Tr.") at pp. 21–26. Bennett, the nephew of the murdered witness, James Bennett, testified that he met Mastrangelo in late 1975, Tr. at p. 32, and that he and Mastrangelo subsequently engaged in approximately 12 to 15 drug transactions. Tr. at p. 41.

Bennett testified that in January, 1978 Mastrangelo offered him $10,000 to assist in the unloading of a large shipment of marijuana. Tr. at pp. 42–43. Bennett refused the offer because "I had jumped bail again and I really didn't want to get involved in it." According to Bennett, Mastrangelo twice renewed this offer and Bennett, for the same reason previously given, rejected it on both occasions. Tr. at pp. 44–45.

Shortly after this, Bennett learned that federal officers had seized a large shipment of marijuana in the Jamaica Bay area of Queens, New York. Bennett concluded "[t]hat Richie [Mastrangelo] lost a lot of grass." Tr. at p. 46.

A few months later Bennett met Mastrangelo at the Canarsie Bar in Brooklyn at Mastrangelo's request. According to Bennett, Mastrangelo told him at this meeting that Mastrangelo was concerned that James Bennett would implicate him in the Jamaica Bay drug conspiracy. Tr. at p. 49. Mastrangelo asked Bennett to intercede with James Bennett in an attempt to dissuade him from testifying against Mastrangelo before the grand jury. Tr. at p. 49. Bennett refused this request, suggesting instead that Mastrangelo offer James Bennett a $100,000 bribe. Tr. at pp. 49–50. According to Bennett, Mastrangelo responded as follows:

BENNETT: He [Mastrangelo] said that I shouldn't be concerned about what he would do to stop my uncle from testifying, that he would—that I should be sure that he wouldn't take the stand against him or words to that effect. I don't recall the exact language that was spoken.

QUESTION: But words to the effect that you shouldn't worry about it?

BENNETT: Right.

QUESTION: That your uncle would never take the stand against him; is that your testimony?

BENNETT: Yes, I don't know if those were the exact words.... The substance was that—that he wouldn't stand for my uncle testifying against him, that that wouldn't happen ....

Tr. at pp. 50–51.

When asked if Mastrangelo had divulged the existence of a plan to prevent James Bennett from testifying, Bennett responded as follows:

BENNETT: Well, I don't recall a word blank [sic] used. He seemed to have something in mind. I don't—I didn't explore what it was that he had in mind. I just didn't want to be involved in whatever he had in mind.

QUESTION: Why do you say he seemed to have something in mind, Mr. Bennett?

BENNETT: He just—I just left with the impression that he had something in mind.

QUESTION: Did Mr. Mastrangelo indicate to you whether he had already spoken to Mr. Bennett?

BENNETT: Yes, he told me that he had spoke to him and that he didn't think that he got across to him, how serious he was about him not testifying against him.

QUESTION: Did Mr. Mastrangelo tell you in substance that there was no way that that man was going to take the stand against him?

BENNETT: Yes, in substance that's what I understand what he said.

Tr. at pp. 52–53.

### 2. NICHOLAS BERARDI

The Government next called Nicholas Berardi, also a participant in the federal witness protection program, Tr. at p. 210, who, like Joseph Bennett, has a substantial

criminal record. Tr. at pp. 211–212. Berardi met Mastrangelo in August, 1981 at the Metropolitan Correctional Center in New York where both men were incarcerated. Tr. at p. 214. Berardi and Mastrangelo became friends and talked on a regular basis. Tr. at p. 215.

The most significant portion of Berardi's testimony related to a conversation he had with Mastrangelo in November, 1981 concerning the killing of James Bennett. Tr. at p. 222. The pertinent portion of Berardi's direct examination follows:

> QUESTION: All right. Now did you have a specific conversation with Mr. Mastrangelo regarding the death of James Bennett?
>
> BERARDI: Yes, we did.
>
> \* \* \* \* \* \*
>
> QUESTION: What did you tell him about the timing of James Bennett [sic]?
>
> BERARDI: I had mentioned something, you know, his friends, just, idle talk, that his friends are doing no favor by whacking out this guy on the day of his [Mastrangelo's] trial.
>
> QUESTION: And what did he say to you?
>
> BERARDI: He said to me he had no choice, no alternative and it had to be done, a phone call was made and it had to be done.
>
> QUESTION: What did he tell you about the phone call?
>
> BERARDI: Just said that a phone call was made and he had to get whacked out.
>
> QUESTION: Who did he say received the phone call?
>
> BERARDI: He didn't say.

Tr. at pp. 222–223.

> The Court then questioned Berardi:
>
> THE COURT: I am confused about who called whom. Who received the call and where was it? Did Mr. Mastrangelo—let me ask the question—did Mr. Mastrangelo tell you who placed the call?
>
> BERARDI: No, he didn't.

> THE COURT: Did he tell you who specifically received the call?
>
> BERARDI: No, he didn't.
>
> THE COURT: He told you that a call was received the night before the hit, the night before the murder?
>
> BERARDI: A phone call was made.
>
> THE COURT: A phone call was made?
>
> BERARDI: That's right.
>
> THE COURT: Based on your conversation with Mr. Mastrangelo, did he tell you why the call was made or what the purpose of the call was?
>
> BERARDI: No, he didn't.

Tr. at p. 225.

During his redirect testimony Berardi, in response to a question from the Court, offered his opinion on the purpose of the phone call in question:

> QUESTION: Phone call was made to find out where the witness Bennett, the dead witness Bennett was? Is that what you're saying?
>
> BERARDI: Yes.

Tr. at 439.

As the flavor of the foregoing excerpts might suggest, Berardi cannot be described as a commanding witness. His testimony lacked coherence and, in some cases, consistency. For example, he also testified that, when interviewed by Assistant United States Attorney Walter Mack on February 26, 1982, he stated, in substance, that Mastrangelo did *not* know about the murder and did *not* know the murder was going to occur. Tr. at p. 431. Moreover, Berardi stated that Mastrangelo may have learned of the phone call *after* the killing. Tr. at pp. 432, 433, 436, 456.

Despite Berardi's testimony that Mastrangelo may not have learned until after Bennett's killing about the placement of the phone call disclosing the whereabouts of Bennett to his killers, Tr. at pp. 432–433, 436, 456, Berardi stated that he believed Mastrangelo had prior knowledge that Bennett was to be murdered:

> QUESTION: All right. If you told an agent or Walter Mack in February that Mastrangelo did not know the murder

was going to occur, tell the Judge exactly what it is you meant by that.

BERARDI: Just what I said.

QUESTION: Say it again.

BERARDI: He didn't know—he knew—I imagine he knew it was going to happen eventually.

THE COURT: That's the key question.

QUESTION: Is it your opinion based on your conversations with Richard Mastrangelo that he knew the murder was going to occur?

BERARDI: Yes.

Tr. at p. 444.

The Court then questioned Berardi regarding the basis of his opinion that Mastrangelo had prior knowledge of a plot to eliminate James Bennett:

THE COURT: The critical question is did he know that it would happen? And you've said "yes" to that several times. But in answer to Mr. Shargel [Mastrangelo's counsel], you said yes, in my opinion, I imagine it, I speculate it, as common sense. In answer to Mr. Muller's [Assistant United States Attorney] question you said it's based on what Mr. Mastrangelo told me.

BERARDI: Many conversations.

THE COURT: That's the area that's gray and it's got to be cleared up if this issue is to be settled. What is it in Mr. Mastrangelo's conversation with you that leads you to believe he knew the witness would be killed?

BERARDI: He knew that it was—I would put it he knew the guy was going to get whacked out.

THE COURT: How did he know it? How do you know he—?

BERARDI: Talk—I am giving—that's the only thing I could do, give you my feeling based on conversations with him.

THE COURT: You say "based on conversations." You must tell me, if you can, what—

BERARDI: A period of four months, your Honor, with this guy, 17 hours a day.

THE COURT: What did he say to you? What did he say to you that would support your—

BERARDI: I am sticking to my statement of November.

THE COURT: I'm sorry?

BERARDI: I'm sticking to my statement of what he told me in November. Phone call was made and the guy had to get whacked out.

THE COURT: Is that the sole source of your conclusion?

BERARDI: Yes, yes. I have to stick with that.

Tr. at pp. 447–48.

### 3. WALTER MACK

Assistant United States Attorney Walter Mack testified about his February 26, 1982 interview of Berardi. This interview was conducted in the presence of an FBI agent whose identity was not revealed at the hearing for fear of prejudicing ongoing investigations of organized crime. Tr. at p. 459.

Mack, having been called as a defense witness, testified that the FBI Agent's draft report of Mack's February 26th interview with Berardi was not entirely accurate. Tr. at p. 466. The report, a general recapitulation of Berardi's statements to Mack concerning Mastrangelo, stated: "Mastrangelo did not know the murder was going to occur, or who actually did it; however, it is clear that he was the beneficiary." Defense Exhibit C. Mack testified that he was dissatisfied with the report "[b]ecause it did not comport with my recollection of what had been said." Tr. at p. 495. Mack's testimony on cross-examination concerning his interview of Berardi was as follows:

MACK: It was very clear after talking to Nicky [Berardi] that at least Richard Mastrangelo's statements to him did not imply that your client [Mastrangelo] knew that James Bennett would be walking down the street at that time and there was going to be—was going to be shot. But he [Mastrangelo] did know that people within his organiza-

tion were going to see to it that James Bennett never made it to court. That was the import and the basis of what Berardi said. Berardi said that Richard Mastrangelo said.

THE COURT: Insofar as that document [the Agent's draft report of Mack's February 26, 1982 interview of Berardi] suggests to the contrary, that document is wrong?

MACK: That's correct.

Tr. at pp. 499–500; *see also* pp. 501, 504 and 507.

Although the Agent who was present with Mack at the February 26th interview of Berardi did not testify at the hearing, the parties stipulated that the Agent's testimony would have been that the sentence within the Agent's report which stated that "Mastrangelo did not know the murder was going to occur ..." means that "Mastrangelo did not know the details of the murder, and did not know it would occur precisely when it did." Tr. at p. 519. The stipulation further provided that "[t]he Agent does not recall if Berardi believes Mastrangelo had prior knowledge that the witness would be killed." *Id.*

### FINDINGS

**(1)** *Preponderance Of The Evidence Standard*

In *Addington v. Texas,* 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), the Court explained that the function of any particular standard of proof is " 'to instruct the fact finder concerning the degree of confidence our society thinks he sould have in the correctness of factual conclusions for a particular type of adjudication.' " *Id.* at 423, 99 S.Ct. at 1807, *quoting In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368 (1970) (Harlan, J. concurring).

In the present case, the Court of Appeals has stated that "[w]e see no reason to impose upon the government more than the usual burden of proof by a preponderance of the evidence where waiver by misconduct is concerned." *United States v. Mastrangelo,* 693 F.2d at 273. The preponderance standard, in turn, "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.' " *In re Winship,* 397 U.S. at 371–372, 90 S.Ct. at 1076 (Harlan, J. concurring) (citation omitted).

Having observed the demeanor of Bennett and Berardi on the stand, I find their testimony generally credible. I state this advisedly after consideration of their substantial criminal records and their possible motivations for perjury. *See* Defendant's Post-Hearing Synopsis Of The Evidence and Memorandum of Law, pp. 23–25 and 32–36.

Although not free of inconsistencies, their testimony, taken as a whole, was persuasive evidence of Mastrangelo's prior knowledge of a plot to kill James Bennett. Joseph Bennett testified that Mastrangelo was determined to prevent James Bennett from taking the stand; and Nicholas Berardi testified that according to Mastrangelo the elimination of Bennett was a necessity. Although no direct evidence was adduced to establish Mastrangelo's prior knowledge of the plot to kill James Bennett, Mastrangelo's statements to Bennett and Berardi constitute circumstantial evidence from which the inference of prior knowledge may be drawn.

Mastrangelo contends that Berardi's testimony constitutes nothing more than an unsubstantiated opinion by Berardi that Mastrangelo had prior knowledge. He argues that Berardi's opinion is insufficient to support a finding of Mastrangelo's prior knowledge. The Court, as trier of the facts, may reject the opinion of a witness as unsubstantiated by that witness' personal knowledge and yet arrive at the same conclusion the witness has reached after analyzing all the evidence in the case. The Court's conclusion, then, is not the improvident adoption of a witness' unsubstantiated opinion, but rather an independent finding of fact based upon all the available evidence.

■ Examination of all the available evidence reveals the following: (1) Mastrangelo had an obvious motive to conceal a plot to kill James Bennett since Bennett was to be the principal witness against Mastrangelo at trial. (2) Mastrangelo's statement to Joseph Bennett that James Bennett would never take the stand, is evidence of Mastrangelo's intent to prevent James Bennett from testifying, or, at least, of his knowledge that others would prevent James Bennett from testifying. (3) Mastrangelo's statement to Berardi that "it had to be done", considered together with his prior statement to Joseph Bennett that James Bennett would never be allowed to take the stand, is further evidence of Mastrangelo's prior knowledge. It is a strained interpretation that the statement, "it had to be done", merely explained in retrospect, either the reason for or the timing of an act of violence that was completely unanticipated by its principal beneficiary. (4) Even though parts of Berardi's testimony indicate that Mastrangelo may not have learned until after Bennett's killing about the placement of the phone call to which Mastrangelo referred in his statement to Berardi (that a phone call was made and it had to be done), such testimony does not preclude a finding that Mastrangelo had prior knowledge of a plot to kill Bennett.

It is, of course, unnecessary for the Government to prove that Mastrangelo had prior knowledge of all the details which were presumably communicated during the phone call. It is enough to show that Mastrangelo had general knowledge of a plan to murder Bennett. This the Government has done by a preponderance of the credible evidence. Accordingly, I hold that Mastrangelo, through his own misconduct, waived his confrontational objection to the use of James Bennett's grand jury testimony.

### (2) *Clear and Convincing Evidence Standard*

■ The mandate of the Court of Appeals also directed this Court to make findings under the clear and convincing evidence standard. *United States v. Mastrangelo,* 693 F.2d at 273–74. To meet the clear and convincing standard it is not required that the evidence be unequivocal or of such a quality so as to dispel all reasonable doubt. *Addington v. Texas,* 441 U.S. at 423, 99 S.Ct. at 1807. The clear and convincing standard, however, does require from the fact-finder a distinctly higher degree of certainty than does the preponderance standard. *Id.* at 432–33, 99 S.Ct. at 1812. It has been said that:

[T]he term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

30 Am.Jur.2d *Evidence* § 1167 (1964); *Hobson v. Eaton,* 399 F.2d 781, 784 n. 2 (6th Cir.1968), *cert. denied,* 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969).

Upon examination of all available evidence I find that the Government has failed to establish by clear and convincing evidence Mastrangelo's prior knowledge of a plot to murder James Bennett. The testimony of Joseph Bennett and Nicholas Berardi, although sufficient to support a probability-based finding of Mastrangelo's prior knowledge, lacked the degree of specificity and precision demanded by the clear and convincing standard.

### MOTION FOR A NEW TRIAL

■ At the conclusion of the evidentiary hearing Mastrangelo moved for a new trial pursuant to Fed.R.Cr.P. 33. In support of his motion, Mastrangelo alleges that:

[T]he recent hearing established that when the government made application for the admission of James Bennett's grand jury testimony, it mislead [sic] the

court into believing that Bennett was the only witness who could have connected Mastrangelo to the narcotics conspiracy with which he was charged. In reality, though, the government was aware that Joseph Bennett, James Bennett's nephew, could provide even more direct testimony on this issue. Further, Bennett was bound by a plea agreement with the government that obligated him to testify against Mastrangelo. Nonetheless, the government did not attempt to enforce the terms of that agreement. Rather, it agreed to allow Joseph Bennett to make an off the record proffer as to what he knew about Mastrangelo. After making this proffer, Bennett then refused to testify and the government moved for the admission of his uncle's grand jury testimony.

Affidavit of Gerald L. Shargel, at para. 5 (January 13, 1983).

Mastrangelo argues that by withholding knowledge of the existence of Joseph Bennett, the Government deprived the Court of information that was crucial to its February, 1982 decision to admit into evidence, pursuant to Fed.R.Evid. 804(b)(5), the grand jury testimony of the murdered witness James Bennett. *See United States v. Mastrangelo*, 533 F.Supp. 389 (E.D.N.Y.), *remanded*, 693 F.2d 269 (2d Cir.1982).

Rule 804(b)(5) provides for the admissibility of:

A statement not specifically covered by any of the foregoing [hearsay] exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Mastrangelo argues that James Bennett's grand jury testimony should not have been admitted under Rule 804(b)(5) because (1) the testimony of Joseph Bennett would have been more probative on the issue of Mastrangelo's participation in the Jamaica Bay narcotics conspiracy, and (2) such testimony was procurable through reasonable efforts on the part of the Government.

On April 2, 1979, James Bennett testified before a grand jury that he sold Mastrangelo four trucks that were subsequently seized by federal narcotics agents on November 11, 1978 at the Jamaica Bay marina. At the time of the seizure, the trucks were laden with drugs.

James Bennett also identified for the grand jury a tape recording of a February 1, 1979 conversation between Bennett and Mastrangelo. The recorded conversation, made in cooperation with federal agents, contains statements by Mastrangelo to Bennett "which, viewed in print, might reasonably be interpreted as threats intended to deter Bennett from identifying Mastrangelo as the purchaser of the trucks." *United States v. Mastrangelo*, 693 F.2d at 271.

Joseph Bennett, the nephew of James, by comparison, testified at the recent evidentiary hearing on remand that on three occasions Mastrangelo offered him $10,000 to assist in the off-loading of some twenty tons of marijuana which would arrive by ship at a future date. Joseph Bennett testified that he rejected Mastrangelo's offer on each occasion, because he (Joseph) had "jumped bail" and did not wish to become involved. Tr. at pp. 42–46.

Assuming that the testimony given by Joseph Bennett at the recent evidentiary hearing is more probative on the issue of Mastrangelo's guilt than was the grand jury testimony, which resulted in Mastrangelo's conviction, Rule 804(b)(5)(B) would have allowed the admission of the grand jury testimony only if it could be shown that, at the time of trial, Joseph Bennett's testimony could not be procured by reasonable efforts. The defendant forcefully argues that Joseph Bennett was quite available to testify.

The Government counters that Joseph Bennett's November 16, 1979 plea agreement in no way obligated Bennett to give

testimony in the *Mastrangelo* case. Rather, the Government contends, the agreement by its terms required Bennett to testify only in cases unrelated to *Mastrangelo* concerning stolen automobiles, interstate shipment of such vehicles, counterfeit auto titles and stolen caterpillar equipment. *See* Government Exhibit 8; Affirmation of Assistant United States Attorney Susan Shepard, at p. 3 (February 14, 1983).

The Government asserts that, despite its view that Bennett was not obligated to testify under the terms of the 1979 plea agreement, it, nonetheless, made every effort to persuade him to do so. Bennett, however, persisted in his refusal to testify, stating that, if called, he would disavow knowledge of Mastrangelo's involvement in the drug conspiracy and recant his prior testimony in the stolen equipment cases. Affirmation of Assistant United States Attorney William J. Muller, at pp. 5–6 (February 14, 1983).

Given Bennett's testimonial recalcitrance, the Government then persuaded him to make an off the record proffer of what he knew about Mastrangelo on the promise that he would not be forced to testify. *Id.* After Bennett's proffer, the Government again tried to persuade him to take the stand against Mastrangelo voluntarily. *Id.* In view of Bennett's threat to sabotage the Government's case against Mastrangelo, the Government decided not to force the issue through any form of compulsory process. *Id.* at 6–7.

Ultimately, the Government concluded that, despite its reasonable efforts to make Bennett testify, his testimony was "not procurable" within the meaning of Fed.R.Evid. 804(b)(5)(B). *Id.* at 7. The Government then moved under Rule 804(b)(5) to admit into evidence the murdered James Bennett's grand jury testimony. Significantly, the Government failed to apprise the Court of the existence of Joseph Bennett as a possible source of evidence. *Id.* The Court, after finding that the requirements of Rule 804(b)(5) had been met, admitted into evidence the grand jury testimony of James Bennett. *United States v. Mastrangelo*, 533 F.Supp. at 390–391.

Having reviewed Joseph Bennett's November 16, 1979 plea agreement, I agree that Bennett was not obligated by that agreement to give testimony concerning the Jamaica Bay drug conspiracy. This conclusion, however, does not end the inquiry. Mastrangelo argues with considerable force that, as an evidentiary matter, Rule 804(b)(5)(B) obligated the Government to seek a court order compelling Joseph Bennett's testimony prior to seeking admission of James Bennett's grand jury testimony. Mastrangelo's contention frames the following question: Under Rule 804(b)(5)(B) does the Government's obligation to show that Joseph Bennett's testimony was not procurable "through reasonable efforts" require it to demonstrate that Joseph Bennett was "unavailable" as defined by Rule 804(a)(2)?

If the answer is yes, then (assuming Joseph Bennett's live testimony would have been more probative than James Bennett's grand jury testimony) the grand jury testimony was improperly admitted. This is so because "an order of the Court is an essential component in a declaration of unavailability under Rule 804(a)(2)." *United States v. Oliver*, 626 F.2d 254, 261 (2d Cir.1980).

I hold, however, that under the circumstances of this case, the Government's obligation under Rule 804(b)(5)(B) to use reasonable efforts to procure arguably more probative testimony did not include the requirement of demonstrating Joseph Bennett's unavailability as a witness within the technical definition of Rule 804(a)(2). Accordingly, the Government was not obligated to procure a Court order compelling Joseph Bennett to testify before seeking admission of James Bennett's grand jury testimony. The requirement of a court order before declaring that a recalcitrant witness is unavailable is intended to safeguard the defendant from the hearsay statements of the recalcitrant witness himself. Here it was not the statement of the recalcitrant witness (Joseph Bennett) that was admitted; it was the statement of the deceased witness, James Bennett, that was admitted under 804(b)(5).

On balance, the efforts made by the Government to procure Bennett's testimony were reasonable. *See* Affirmation of Assistant United States Attorney William J. Muller (February 14, 1983). There is nothing inherently unreasonable in eliciting Bennett's off the record proffer by promising him that he would not be forced to testify against Mastrangelo. That decision is within the province of the United States Attorney and not of this Court.

That is not to say, however, that the Government has carte blanche to represent to any potential witness that he will not be called to testify, thereby paving the way for the admission of a deceased witness' grand jury testimony under Rule 804(b)(5). Good faith and right reason must be assumed. Upon careful examination of the record, I find no abusive intent or bad faith on the part of the Government.

I add, however, that the Government exercised extraordinarily poor judgment in failing to apprise the Court of the existence of Joseph Bennett at the time of its application for the admission of James Bennett's grand jury testimony. The Government's unilateral determination that Joseph Bennett's testimony was not procurable through reasonable efforts usurped the Court's responsibility to administer the rules of evidence fairly through the process of informed decision-making. *See* Fed.R. Evid. 104(a) and (b). Despite the fact that I have now concluded that Joseph Bennett's testimony was not procurable through reasonable effort, I would have preferred to have made that determination prior to trial, and not in the context of a subsequent motion for a new trial.[1]

As an alternative ground for the denial of Mastrangelo's motion for a new trial, it is clear that had Joseph Bennett taken the stand, his anticipated testimony concerning Mastrangelo's three attempts to persuade Bennett to join the narcotics conspiracy would have been anything but exculpatory in nature. Indeed, Mastrangelo finds himself in the curious posture of arguing that under Rule 804(b)(5), the anticipated testimony of Joseph Bennett would have been more probative of his guilt than was the grand jury testimony of James Bennett.

Lastly, I note that Mastrangelo's motion for a new trial is based primarily upon his hearsay objection that James Bennett's grand jury testimony was admitted improperly under Fed.R.Evid. 804(b)(5). The Court of Appeals, in its opinion remanding this case, held that "although Judge Weinstein's finding [that Mastrangelo had prior knowledge of a plot to kill James Bennett] is not dispositive in the present proceeding, it raises an issue as to whether Mastrangelo waived his sixth amendment rights and, *a fortiori,* his hearsay objection." *United States v. Mastrangelo,* 693 F.2d at 272. On remand, this Court has found by a preponderance of the evidence, that Mastrangelo indeed waived his sixth amendment rights through his own misconduct. That finding, to paraphrase the language used by the Court of Appeals, leads to the *a fortiori* conclusion that Mastrangelo has also waived the very evidentiary objection upon which he bases his motion for a new trial.

For all the foregoing reasons, then, defendant's motion for an order pursuant to Fed.R.Cr.P. 33 granting him a new trial is denied.

SO ORDERED.

---

1. I also reject, as unpersuasive, Mastrangelo's separate argument that, because the Government entered the proffer agreement with Joseph Bennett, the "interests of justice" would have been best served by excluding the grand jury testimony of James Bennett. *See* Fed.R. Evid. 804(b)(5)(C). Such an argument is premised upon the assumption that it was unreasonable for the Government to promise Bennett that he would not have to testify. I have found otherwise, however, in the context of evaluating, under Rule 804(b)(5)(B), the reasonableness of the Government's efforts to procure Bennett's testimony.