*213 OPINION OF THE COURT
Anne E. Feldman, J.
Defendant was convicted by a jury of murder in the second degree. During the course of trial he challenged this court’s decision permitting the prosecution to call and question a recalcitrant witness. This opinion reflects the grounds for that decision.
At issue is the refusal of Julio Caraballo to testify at trial. Mr. Caraballo, defendant’s uncle, testified before the Grand Jury that defendant had admitted to him that he shot Charles Brown, the decedent in this case. Caraballo had been cooperative with the District Attorney’s office until the eve of his scheduled testimony. However, on the day he was to be called as a witness, Mr. Caraballo, who was incarcerated on an unrelated crime, indicated for the first time that he did not wish to testify at all.*
He told a court-appointed attorney, counseling him about an open case, that he was reluctant to testify because his family had been threatened. He elaborated on this alleged threat to the District Attorney’s investigator who subsequently questioned him in the presence of his attorney. At that time he claimed that during a telephone conversation made that morning from the District Attorney’s office, his wife had told him that defendant’s sister had threatened harm to his "loved ones” if he testified against defendant. The prosecution moved to admit Caraballo’s Grand Jury testimony, seeking a Mastrangelo hearing, pursuant to United States v Mastrangelo (693 F2d 269, on remand 561 F Supp 1114, affd 722 F2d 13, cert denied 467 US 1204) and Matter of Holtzman v Hellenbrand (92 AD2d 405) to determine whether defendant waived his right to confrontation by causing the witness’ unavailability.
Initially Caraballo refused to explain his refusal to testify, answering all questions either, "I don’t want to hear any more comments about this” or "my lawyer knows all about it”. However, after defendant’s counsel advised him in the presence of his attorney that if the court found he had been threatened by defendant, it might allow the jury to hear his *214 Grand Jury testimony, he told defense counsel and later the court that his change of heart was not based on any threats, but on his familial relationship with defendant.
To all other questions Caraballo responded, "I don’t want to hear any more comments about this.”
Based on Caraballo’s testimony and the testimony of Detective Investigator Rodriguez that defendant’s sister and Caraballo’s wife denied any conversations with one another, I denied the prosecution’s motion and precluded the introduction of Caraballo’s Grand Jury testimony at trial. However, I advised Mr. Caraballo as follows:
The court: "All right. Well, Mr. Caraballo, I may permit the District Attorney to call you as a witness and you will have to come into the courtroom and all the jurors will be present and you may be asked a series of questions again about this whole situation and what you may or may not know about it and that will be up to you to decide whether you want to face a Contempt of Court with the possibility of a sentence of up to one year or whether you want to testify as to what you do or do not know about this case. Do you understand what I told you?”
The witness: "Yes.”
Thereafter, I allowed the prosecutrix to call Caraballo as a witness before the jury, as "one last effort on the court’s part to have him testify”, severely limiting the scope of the permissible inquiry. The witness answered only an inquiry about his address, insisting in response to all other background questions and to the court’s explanation that he risked a contempt finding, "I don’t want to hear any more comments about this.”
Calling a side bar, the court noted the witness’ increased reluctance and allowed the prosecutrix to ask him only one final question.
"(Q) Mr. Caraballo, did you or did you not go to the District Attorney’s office on May 9, 1989 and testify before the Grand Jury in Kings County, under oath, concerning a statement that Eddie Rivera, your nephew, made to you about the death of Charles Brown.
"(A) I don’t want any more comments about this.”
In cross-examining Caraballo, defense counsel sought to impugn his credibility by questioning him concerning his criminal record. Once more Caraballo responded only, "I don’t want to hear any more comments about this.” On redirect examination the trial assistant asked him if he had been *215 threatened to which he gave the same response. To avoid the possibility that the jury might infer that Caraballo’s refusal to testify was attributable to fear of the defendant, the court advised counsel that the witness could be asked if at the Mastrangelo hearing he had testified that his refusal to testify was not because of threats, but because defendant was his nephew.
The trial assistant asked as follows:
"(Q) At that time, sir, were you asked this question and did you give this answer?
"By the court: Mr. Caraballo, are you prepared to tell us why you are not willing to testify in this case?
"The Witness:—
"That’s you, sir—
"I do not want to testify against him. He is my nephew.”
When the court asked, "do you recall being asked that question and giving that answer”?, Caraballo replied, "well, I remember, but I don’t want any more comments about this.” Defendant’s counsel declined further cross-examination.
The court thereupon excused the witness and gave the jury the following curative instruction:
The court: "Members of the jury, as you have seen, Mr. Caraballo has refused to answer questions put to him by the District Attorney.
"He has done so in the face of my direction to him that he give these answers and in the face of my ruling that he may be held in criminal contempt of court, which is a crime for which he can be imprisoned for up to one year. You have heard all that.
"However, I want to be sure you understand that you may not speculate as to what he would have testified to had he not made these — made the responses that he did make.”
"The decision to permit the People to call a witness who has already indicated that he or she will refuse to testify is one resting within the sound discretion of the trial court” (People v Berg, 59 NY2d 294, 298 [1983]). The court must determine whether the State’s interest in presenting such a witness outweighs any prejudice to defendant. (Supra.) In so doing the court must consider the surrounding circumstances and focus primarily on two factors: first, whether the prosecution’s motive in calling the witness was to demonstrate his refusal to cooperate enabling the jury to draw unwarranted inferences *216 against defendant; and second, whether the witness’ refusal to testify adds critical weight to the prosecution’s case in a form not subject to cross-examination. (Supra.)
Here the prosecutrix was endeavoring in good faith to elicit testimony from the witness. She was permitted to call him only after his resolve not to testify appeared to the court to have weakened. Because he had changed his reason for not testifying from "threats by defendant” to "family loyalty”, it seemed possible that he might again change his mind and decide to testify if he were questioned before a jury. The prosecutor, asking only the questions prescribed by the court, could not have anticipated the witness’ refusal to answer even questions to which he had previously responded.
Unlike the prosecutor in People v Beaman (122 AD2d 848 [2d Dept 1986]), the prosecutrix here did not capitalize on the witness’ refusal to testify. Having made no mention of Caraballo’s testimony in her opening statement, she did not exploit his refusal to testify on summation. Indeed, even her cursory and oblique reference to that refusal led to an immediate court instruction to the jury not to speculate on what Caraballo’s testimony would have been.
With respect to the second factor outlined in Berg (supra), the witness’ refusal to answer did not add critical weight to the prosecution’s case. Certainly, an admission by any defendant to a third party that he had committed the crime in question would have been helpful to the prosecution. However, here such testimony was not critical in establishing the defendant’s guilt. It had been established independently by more contemporaneous evidence. (Cf., People v Beaman, supra.)
Finally, the jury also was able to consider defendant’s version of the events. The defendant took the stand and testified that had shot the deceased in self-defense. The court permitted cross-examination based on the contrary version he had allegedly given his uncle ("I shot him three times.”). Defense counsel’s objections to and motions for a mistrial based on this cross-examination were without merit. Caraballo’s sworn Grand Jury testimony and similar statements he had made to the police and District Attorney’s office provided the prosecution with a good-faith basis for questioning defendant about this statement. Caraballo’s refusal to give the same testimony before a petit jury does not preclude its use on *217 cross-examination solely for the purpose of impeaching the defendant’s credibility as the jury was instructed.
Accordingly, defendant was not unfairly prejudiced by Caraballo’s appearance before the jury or by the prosecution’s use of Caraballo’s Grand Jury testimony to impeach him.

 Although he had on one occasion confided to Detective Investigator Rodriguez that he was "concerned something might happen to him” and on another had refused to talk about his testimony in the presence of another inmate, he had never said anything which led the People to believe he would refuse to testify at trial.