**LIFESCAN, INC., Plaintiff,**

v.

**HOME DIAGNOSTICS, INC., and MIT Development Corp., Defendants.**

**No. Civ.A. 96–597–JJF.**

United States District Court,
D. Delaware.

June 20, 2000.

Richard Kirk, Gretchen Ann Bender, Morris, James, Hitchens & Williams, Wilmington, DE, of counsel Philip S. Johnson, Dianne B. Elderkin, Joseph Lucci, Barbara L. Mullin, and Lynn A. Malinoski, Woodcock Washburn Kurtz Mackiewicz & Norris LLP, Philadelphia, PA, for plaintiff.

Arthur G. Connolly, Jr., Arthur G. Connolly, III, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Michael L. Donovan,

Paul S. Rosenlund, Peter J. Whalen and Anne Marie Heimberger, Hancock Rothert & Bunshoft LLP, San Francisco, CA, for defendants.

## OPINION

FARNAN, Chief Judge.

This action was brought by Plaintiff, LifeScan, Inc. against Defendants, Home Diagnostics, Inc. and MIT Development Corp. alleging that Defendants' manufacture and sale of the Prestige meter, a device used by diabetic patients to monitor their blood sugar levels, infringes U.S.Patent No. 5,049,487 ("the '487 Patent"). A nine-day jury trial was held, and the jury returned a verdict finding that (1) both the current version and the earlier version of Defendants' Prestige meter infringed Claim 1 of the '487 Patent under the doctrine of equivalents, (2) Defendants induced the infringement of the '487 Patent and (3) Plaintiff was entitled to damages in the form of a reasonably royalty in the amount of $5,860,940. While the jury found in favor of Plaintiff under the doctrine of equivalents, the jury did not find that either version of Defendants' Prestige meter literally infringed Claim 1 of the '487 Patent. Following the jury's verdict, Defendants filed a Renewed Motion For Judgment As A Matter Of Law (D.I. 442) and a Motion For Partial New Trial (D.I.441). For the reasons set forth below, Defendants' Motion For Judgment As A Matter Of Law will be granted on the issue of infringement and denied on the issue of validity, and Defendants' Motion For A New Trial will be denied.[1]

## STANDARD OF REVIEW

### I. Motion For Judgment As A Matter Of Law

■ To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party " 'must show that the jury's findings, presumed or express are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.' " *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984)); *accord Price v. Delaware Department of Correction*, 40 F.Supp.2d 544, 549 (D.Del.1999). In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.), *reh'g en banc denied*, 1991 U.S.App. LEXIS 16758, 1991 WL 228122 (3d Cir.1991); *Perkin–Elmer Corp.*, 732 F.2d at 893. The court may not evaluate the credibility of the witnesses, may not weigh the evidence, and may not substitute its view of the evidence for the jury's view. *Price*, 40 F.Supp.2d at 550 (holding that judgment as a matter of law may not be granted where jury's view of evidence differs with that manifested in jury's verdict, because such action would usurp jury's role as factfinder). Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed.Cir. 1998); *Gomez v. Alleghany Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir.1995) (describing standard as "whether there is evidence upon which a reasonably jury could properly have found its verdict"); 9A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2524 at

---

1. The parties also contest the issue of whether the '487 Patent is unenforceable as a result of inequitable conduct by Plaintiff before the United States Patent and Trademark Office. This issue was not presented to the jury at trial, and the parties briefed it separately for the Court's consideration as a bench matter. (Tr. at 2568:23–2570:15, 2571:10–2574:15). Accordingly, the Court will address the inequitable conduct issue by a separate Memorandum Opinion and Order.

249–266 (3d ed. 1995) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury properly could find a verdict for that party.")

## II. Motion For A New Trial

■ In pertinent part, Federal Rule of Civil Procedure 59(a) provides:

A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

Fed.R.Civ.P. 59(a). Among the most common reasons for granting a new trial are the following: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *Zarow–Smith v. New Jersey Transit Rail Operations,* 953 F.Supp. 581, 584 (D.N.J.1997) (citations omitted).

■ The decision to grant or deny a new trial is committed to the sound discretion of the district court. *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Olefins Trading, Inc. v. Han Yang Chem Corp.,* 9 F.3d 282 (1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). However, where the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *Klein v. Hollings,* 992 F.2d 1285, 1290 (3d Cir.1993). Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a

matter of law in that the court need not view the evidence in the light most favorable to the verdict winner, a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks our conscience." *Williamson,* 926 F.2d at 1352; *see also Price,* 40 F.Supp.2d at 550.

## DISCUSSION

### I. Defendants' Motion For Judgment As A Matter Of Law On The Issue Of Infringement

In support of their Motion For Judgment As A Matter Of Law on the issue of infringement, Defendants raise four arguments. First, Defendants contend that prosecution history estoppel precludes the scope of equivalence that the jury found by virtue of its verdict that the Prestige glucose meters infringed Claim 1 of the '487 Patent under the doctrine of equivalents. Second, Defendants contend that substantial evidence does not support the jury's finding of equivalence. Third, Defendants contend that Plaintiff's admissions limit the scope of its patent claims to in-meter application testing. Lastly, assuming the '487 Patent is limited to in-meter testing, Defendants contend that substantial evidence does not support a finding that out-of-meter application testing is the equivalent of in-meter application testing.

### A. Whether Prosecution History Estoppel Precludes the Scope of Equivalence Found by the Jury

In arguing that prosecution history estoppel precludes the scope of equivalence found by the jury in this case, Defendants contend that (1) Plaintiff's amendments to Claim 11 of the original '487 patent and (2) Plaintiff's arguments to the PTO during the prosecution of the '487 Patent demonstrate that Plaintiff limited its claims to a time-specific method. Stated another way, Defendants' contend that the method described in the '487 Patent of causing an

analytical measurement to be made is limited to a specific *amount* of time, i.e. a fixed number of seconds.

In response to Defendants' argument, Plaintiff contends that Claim 1 of the '487 Patent is not limited to a time-specific method. Specifically, Plaintiff contends that the amendments it made to the '487 patent were not made to overcome prior art, and Plaintiff did not, by argument or amendment, narrow its claims to surrender coverage for "non-specific time methods" of taking analytical measurements.

### 1. Applicable law

■ The doctrine of prosecution history estoppel limits infringement by otherwise equivalent products or processes. Typically, prosecution history estoppel arises in one of two ways: (1) a change in the scope of a claim is made to overcome an examiner's rejection based on prior art; *Pall,* 66 F.3d at 1218; or (2) even without a rejection based on prior art, an applicant unmistakably and clearly disavows claim coverage during the prosecution of a patent in an effort to obtain the patent. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1580 (Fed.Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Thus, prosecution history estoppel bars a patentee from recapturing through the doctrine of equivalence subject matter which was surrendered by either argument or amendment during the prosecution of the patent. *Insituform Techs. Inc. v. Cat Contracting, Inc.,* 99 F.3d 1098, 1107 (Fed.Cir.1996).

■ Whether the doctrine of prosecution history estoppel applies in a given case is a question of law. *Genentech, Inc. v. Wellcome Foundation Ltd.,* 29 F.3d 1555, n. 35 (Fed.Cir.1994). A rebuttable presumption that prosecution history estoppel applies arises whenever an amendment to a claim is made, but the reasons for the amendment are not shown by the patentee. *Loral Fairchild,* 181 F.3d 1313, 1322 (citing *Warner–Jenkinson,* 520 U.S.

at 33, 117 S.Ct. 1040). As the Supreme Court explained in *Warner–Jenkinson:*

> [T]he burden [is] on the patentholder to establish the reason for an amendment required during prosecution. The court then would decide whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element added by that amendment. Where no explanation is established, however, the court should presume that the PTO had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine [sic, of] equivalents.

520 U.S. at 33, 117 S.Ct. 1040.

■ In determining whether prosecution history estoppel applies in the context of an amendment to a patent, the court should consider the reason for the patent examiner's objection and the manner in which the amendment addressed and avoided the objection. Not all amendments give rise to a claim of prosecution history estoppel. "Amendments may be of different types and may serve different functions." *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1363 (Fed.Cir.1983). Similarly, there may be a variety of reasons why a patent examiner may request a change in claim language. *Warner–Jenkinson,* 520 U.S. at 31, 117 S.Ct. 1040. As the United States Supreme Court has explained:

> If the PTO has been requesting changes in claim language without the intent to limit equivalents, or indeed, with the expectation that language it required would in many cases allow for a range of equivalents, we should be extremely reluctant to upset the basic assumptions of the PTO without substantial reason for doing so. Our prior cases have consistently applied prosecution history estoppel only where claims have been amended for a limited set of reasons, and we see no substantial cause for requiring a

more rigid rule invoking an estoppel regardless of the reasons for a change. *Id.* at 31–32, 117 S.Ct. 1040 (footnote omitted).

■ In determining whether a patentee's arguments during the prosecution of the patent give rise to prosecution history estoppel, the court must determine whether the patentee's arguments amounted to an unequivocal and unmistakable disavowal of the claim coverage in order to obtain the patent. In this type of estoppel, the Court of Appeals for the Federal Circuit has explained:

> While it is true that a patentee's unmistakable assertions to the PTO in support of patentability, whether or not they were truly required to secure allowance of the claim, will estop the patentee from obtaining protection of the subject matter surrendered thereby, ... it is difficult to conclude, in light of the truly equivocal nature of the claim [at issue] and the conflicting evidence in the prosecution history, that [the patentee] surrendered protection ... with the clarity that prosecution history estoppel requires.

*Athletic Alternatives v. Prince Manufacturing,* 73 F.3d 1573, 1582 (Fed.Cir. 1996).

■ If a patentee relinquishes claim coverage by argument or amendment during the prosecution of the patent, the court must determine what subject matter was relinquished. This inquiry is an objective one, which is measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent. Harmon, *Patents and the Federal Circuit* § 6.3(b) at 296 (4th ed.1997).

#### 2. The prosecution of the '487 Patent

Claim 11 of Plaintiff's original patent application ultimately issued as Claim 1 of the '487 Patent. Originally, Claim 11 provided:

> A method of initiating timing of a measurement in a reflectance-reading device, which comprises:
>
> taking at least one first reflectance reading from a dry first surface of a porous matrix prior to application of a sample to a second surface of said matrix;
>
> taking at least one additional reflectance reading from said first surface;
>
> comparing said additional reflectance reading to said first reflectance reading and initiating time measurement upon a predetermined drop in reflectance resulting from said sample reaching said first surface; and
>
> taking at least one measurement reflectance reading at a predetermined time after said additional reflectance reading differs from said reflectance value by said predetermined difference.

In the First Office Action dated November 16, 1989, the Examiner rejected Claim 11 on three grounds: (1) under 35 U.S.C. § 112 as indefinite "for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention" (PX–334 at 61); (2) under 35 U.S.C. § 102(b) as anticipated by, or in the alternative, under 35 U.S.C. § 103 as obvious over prior art known as the Jessop Patent (PX–334 at 63); and (3) under 35 U.S.C. § 102(b) as anticipated by, or in the alternative under 35 U.S.C. § 103 as obvious over prior art known as the Sodickson Patent (PX–334 at 64).

On April 16, 1990, in response to the Examiner's rejection of Claim 11, Plaintiff amended the claim as follows:

> 11. (Amended) A method of [initiating timing of a measurement] *causing an analytical measurement to be made* in a reflectance-reading device *at the end of a predetermined time period after an analyte reacts with reagent in a porous, reflectance-reading matrix located in said device,* which comprises:
>
> taking [at least one] *a* first reflectance reading from a dry first surface of [a] *said* porous matrix prior to application

of a *liquid* sample *suspected of containing said analyte* to a second surface of said matrix *from which said sample can travel to said first surface by capillary action;*

taking [at least one] *an* additional reflectance reading from said first surface *after said sample is applied to said porous matrix;*

comparing said additional reflectance reading to said first reflectance reading and initiating *said predetermined time period* [time measurement] upon a predetermined drop in reflectance resulting from said sample reaching said first surface; and

taking [at least one] *a* measurement reflectance reading at *the end of* [a] *said* predetermined time *period* [after said additional reflectance reading differs from said reflectance value by said predetermined difference].

(PX–334 at 77–78, additions denoted by underlining, deletions by brackets).

In the Second Office Action dated July 20, 1990, the Examiner again rejected Claim 11 on the grounds of indefiniteness and obviousness over the Jessop Patent. In response to the Examiner's second rejection of Claim 11, Plaintiff amended the claim as follows:

11. (Twice Amended) A method of causing an analytical measurement to be made in a reflectance-reading device at the end of a predetermined time period after an analyte reacts with reagent in a porous, reflectance-reading matrix located in said device, which comprises:

taking a first reflectance reading from a dry first surface of said porous matrix prior to application of a liquid sample suspected of containing said analyte to a second surface of said matrix from which said sample can travel to said first surface by capillary action *and react with said reagent in said matrix if said analyte is present in said sample;*

taking an additional reflectance reading from said first surface after said sample is applied to said porous matrix;

comparing said additional reflectance reading to said first reflectance; [and] initiating said predetermined time period upon a predetermined drop in reflectance [resulting from] *sufficient to indicate that* said sample [reaching] *has reached* said first surface; and

taking a measurement reflectance reading at the end of said predetermined time period *without having determined the time at which said sample was initially applied to said porous matrix.*

3. Application of the law of prosecution history estoppel to the prosecution of the '487 Patent

 Applying ·the law of prosecution history estoppel to the prosecution of the '487 Patent, the Court must, as a threshold matter, determine whether the rebuttable presumption that the amendments were made for reasons related to patentability applies in light of Plaintiff's amendments to the '487 Patent. The prosecution history of the '487 patent indicates that the patentholder provided an explanation for the amendments to the claims during the prosecution of the '487 patent. (PX–334 at 78–85, 97–102). Accordingly, the Court concludes that the *Warner–Jenkinson* rebuttable presumption is inapplicable.

Nevertheless, the Court must consider the reasons for Plaintiff's amendments and what, if any, coverage that Plaintiff surrendered as a result of the amendments. Stated another way, the Court's specific inquiry in this case is whether Plaintiff amended the patent to overcome the prior art, and if so, whether Plaintiff surrendered coverage for "non-specific time methods" by its amendments. Harmon, *supra* at § 6.3(b) at 301 ("The fact that claims were surrendered does not always mean that the doctrine of prosecution history estoppel completely prohibits a patent from recapturing some of what was origi-

nally claimed. When claim changes or arguments are made in order to more particularly point out the invention, the purpose is to impart precision, not to overcome prior art.")

After reviewing the prosecution history of the '487 Patent as a whole, the Court concludes that Plaintiff's amendments were not made to overcome the prior art, and even if the amendments were in some way responsive to the prior art, the amendments and arguments made during the prosecution of the '487 Patent did not surrender coverage for "non-specific time methods." Although the Examiner rejected Claim 11 in light of prior art, i.e. the Jessop and Sodickson Patents, the Examiner also rejected Claim 11 on indefiniteness grounds. Elaborating on the rejection of Claim 11 for indefiniteness in the First Office Action, the Examiner stated:

Claim 11 fails to recite clear, distinct and positive process steps. If claim 11 is directed to a method of "initiating timing" (line 1), then the step of taking additional measurements after such initiation is superfluous and should be deleted (lines 15–18). Claim 11 does not clearly recite the structural relationship of the "first" and "second surfaces." Claim 11 does not positively recite application of sample.

It is suggested that "at least one" be written as—a—in claim 11, line 4 because any reflectance reading taken beyond the "first" one is by definition an "additional" reading.

(PX–334 at 61–62).

Examining the substance of the first series of amendments in light of the Examiner's indefiniteness objection, the Court concludes that the amendments made to the '487 Patent go directly to the concerns raised by the Examiner's indefiniteness rejection. For example, the patentee amended the patent from a method of "initiating timing of a measurement" to a method of "causing an analytical measurement to be made" in order to more accurately state the invention and obviate the Examiner's concern that subsequent measurements would be superfluous if the invention were only directed at a method of initiating timing. Likewise, the patentee added language to more specifically recite the structural relationship of the "first" and "second surfaces" and to positively recite application of the sample. For example, the patentee added language to describe application of the "liquid" sample to a "porous matrix" and emphasized that this sample would "travel" between the "porous" first and second surfaces "by capillary action." In addition, the patentee heeded the examiner's suggestion of deleting "at least one" and replacing it with "a" in the patent's discussion of taking reflectance readings.

With regard to the Examiner's prior art rejections, the Court further concludes that the Examiner's rejections in the First Office Action were not directed to the nature of the timing period. For example, in discussing the Jessop Patent, the Examiner stated that Jessop

measures the reflectance of an analytical slide (i.e. porous matrix) both before and after liquid sample is applied to the slide. The difference in reflectance between the "dry" and "wet" readings, respectively, is compared to determine if the slide contains sufficient sample for a suitable test result, i.e. if analysis measurements may be initiated.

(PX–334 at 63–63). The Examiner further explained that "[a]t least one addition [sic] reflectance measurement for analysis purposes is inherent in Jessop." In the alternative, the Examiner stated that:

it would have been obvious [under Jessop] to initiate measurement readings as claimed after the sample had reached the reactants on said analytical slide. Not only is sample presence easily detected but inherent differences in the reflectance characteristics, i.e. background, of each slide is corrected for.

Dye precursor comprising slides are conventional.

(PX–334 at 64).

Similarly in discussing Sodickson, the Examiner explained that Sodickson teaches the taking of "reflectance readings at a reaction site (i.e. first surface) before and after sample migration therethrough. This allows the 'before' or first reading to serve as a blank to produce a reference signal for the analytical measurement." The Examiner found that "[a]dditional measurements comprising the second (sample present) and at least one additional (i.e.endpoint) reading" and "conventional reagent matrices, e.g. containing dye precursor" were inherent in Sodickson. In addition, the Examiner stated that it would have been obvious under Sodickson "to obtain a pre-sample reflectance reading to serve as a reagent blank to correct for non-uniform reagent ... distribution" and "to determine reaction reflectance from sample contact with reagents through linear reaction." (PX–334 at 65).

Thus, after reviewing the Examiner's remarks, the Court finds that the Examiner's concerns were based on such issues as the claimed inventions' use of the change in reflectance due to wetting to automatically start the incubation period, the number of measurements to be taken and the use of matrices containing dye precursors. Because the Court finds that the Examiner's prior art rejections were not concerned with time periods, the Court concludes that the amendments, insofar as they related to the predetermined time period, were not made to overcome the prior art.[2]

Defendants direct the Court to the Second Office Action in which the Examiner again rejected Claim 11 in light of the Jessop patent and stated that "one of ordi-nary skill would have expected the analyzer's computer program to have specific parameters/instructions as to incubation times and measurement times appropriate to the selected test slide." (PX–334 at 90). While the Examiner does touch on time periods in the Second Office Action, it appears to the Court that taken in its totality, the thrust of the Examiner's objection is concerned with the use of the change in reflectance to initiate events. The Examiner explained that Jessop teaches "measuring an initial change in reflectance, i.e. wet (with liquid sample) versus dry (without liquid sample) readings, to determine if the slide contains sufficient liquid sample suitable for a test." The Examiner then stated that the applicant contends that Jessop does not suggest using this initial change in reflectance to automatically cause another reflectance measurement to be taken at a specific time thereafter. It is in response to the applicant's contention concerning the initial change in reflectance that the Examiner mentions time periods. According to the Examiner:

Jessop as a whole ... *does suggest using this initial change in reflectance to automatically cause further events to occur* at specified, preprogrammed times thereafter (depending upon the test analyte being determined).

(PX–334 at 89, emphasis added). The Examiner then goes on to enumerate the events which occur, such as applying liquid to the test slide, analyzing the slide's change in reflectance, and taking the measurement; however, it appears to the Court that these additional comments are by way of further explanation and are not the Examiner's primary focus.

To the extent that the Examiner's remarks can be construed to raise the time period issue, the Court concludes that the

**2.** As the Court has explained the bulk of the amendments to the '487 Patent did not pertain at all to the predetermined time period. Additionally, the Court observes that the concept of a "predetermined time" was in the original patent prior to any amendments. As such, the Court concludes that the amendments that dealt with the predetermined time period were not made to overcome prior art, but to clarify that which was already stated in the patent.

amendments which were made in response to the Examiner's rejection were not made to overcome the prior art insofar as specified time periods are concerned. Two of the three amendments had nothing to do with time periods and were directed at (1) positively reciting the possibility of reaction of reagent with analyte if the analyte were present, and (2) clarifying the language related to a predetermined drop in reflectance to indicate that the drop must be of sufficient quantity to indicate that the sample has reached the first surface. The only amendment which deals in any way with time is the language which specifies that the measurement reflectance reading which is taken does not depend on determining the time at which the sample was initially applied to the porous matrix. The Court does not read this amendment to surrender coverage for non-specific times. Rather, it appears to the Court that this amendment emphasizes that Plaintiff's invention is not time-dependent.

Moreover, the Court concludes that Plaintiff's arguments during the prosecution of the '487 Patent did not surrender nonspecific time methods. To the contrary, Plaintiff's arguments illustrate that a specific time period, fixed in length, was not a requirement of the '487 Patent. For example, in distinguishing the prior art of Jessop and Sodickson, Plaintiff pointed out:

> Applicant's invention *does not reside in the fact that a measurement is made at a specific time after sample is applied to the reagent pad;* rather the invention is related to *how* one determines the time at which measurement will be made. . . . Nothing in either Sondickson [sic] or the Jessop patent points in the direction of using the initial reflectance change to determine the incubation period before making the reflectance reading that determines the amount of analyte present in the sample.

(PX–334 at 83, italicized emphasis added, underlined emphasis in original).

Similarly, in discussing the change from "at least one" reflectance measurement to "a" reflectance measurement, Plaintiff expressly stated that multiple readings are covered by the claims of the Patent. As Plaintiff explained:

> Additionally, Applicant has changed the language discussing "at least one" reflectance measurement to read "a" reflectance measurement. *However applicant would like to make clear that multiple readings are in fact common and are still covered by the claims.* While it is true that any reflectance reading taken beyond the first one is, by definition, an additional reflectance reading so that the present claims read on both single and multiple first and second reflectance readings, in practice these readings are taken automatically at short intervals so that multiple readings are typically taken both before and after the sample is applied to the dry matrix. The record should therefore be clear that this meaning is understood by both applicant and Examiner.

(PX 334 at 81, Tr. at 688:23–692:5, emphasis added). Because multiple readings were contemplated by the '487 Patent and Plaintiff's argument to the Patent Examiner expressly referred to the possibility of multiple readings, the Court concludes that Plaintiff's contemplated, rather than surrendered, a non-time specific method.

Defendants direct the Court to statements made by the Plaintiff during the prosecution history to the effect that reflectance measurements are made at "specific times" after the sample reacts with reagent to support its argument that the method claimed in the '487 Patent is time specific. However, the Court concludes that taken in context, Plaintiff's statements do not suggest that the '487 Patent is limited to a time-specific method. For example, Plaintiff does refer to a reflectance measurement being made at a "specific time after the plasma reaches the area from which the measurement will be taken" (PX–334 at 80); however, Plaintiff

also emphasizes earlier in the same amendment that "it if often important for the measurement to be made at a specific time (*or at least within a specific range of times*) after sample has reacted with reagent in the pad." (PX 334 at 78–80 (emphasis added); Tr. at 688:1–22). That Plaintiff contemplated a range of times illustrates that Plaintiff did not surrender non-specific time methods in favor of a specified amount of time.

Defendants also rely on the '487 Patent's use of the phrase "predetermined time period" to support its contention that the '487 Patent is limited to time specific methods. After reviewing the prosecution history of the '487 Patent, the Court finds insufficient evidence exists to support Defendants' interpretation of the phrase "predetermined time period." Plaintiff did not at any time during the prosecution of the '487 Patent argue that the "predetermined time period" was required to be a fixed or specific length of time. Rather, Plaintiff emphasized that the primary feature of its invention was its time-independent nature. For example, Plaintiff stated that a "key aspect of the present invention is that the timing period is independent of the time at which sample is applied to the matrix." (PX–334 at 100–102).

Moreover, the Court observes that Defendants' interpretation of the phrase "predetermined time period" would be inconsistent with the specification of the '487 Patent, which expressly contemplates multiple reflectance readings at a number of unspecified times after the predetermined drop in reflectance has been detected and the incubation starts, depending on the sample and the level of glucose in the sample. For example, the specification of the '487 Patent provides:

> The liquid sample penetrates the matrix, resulting in an initial change in reflectance at the measurement surface. A reading is then taken *at one or more times* after the initial change in reflectance to relate the further change in reflectance at the measurement surface

or in the matrix as a result of formation of the reaction product to the amount of analyte in the sample.

(PX–137 at col. 3:37–44 (emphasis added)).

That the claimed method is not limited to a single, fixed time period is further emphasized in the specification's reference to a "measuring time span" which varies according to the level of glucose concentration in the test sample. As the specification and disclosed embodiments indicate, longer reaction times may result for samples having high glucose concentrations than for samples with low glucose concentrations, and as such, the length of time between the detection of the predetermined drop in reflectance and the subsequent reflectance measurement is not limited to a fixed number of seconds. For example, the specification states:

> The 635 nm of LED is powered only during a brief measuring time span that begins approximately 20 seconds after the start time as indicated by reflectance switching. If this reading indicates that a high level of glucose is present in the sample, a 30–second reading is taken and used in the final calculation in order to improve accuracy. Typically, high levels are considered to begin at about 250 mg/dl.

(PX–137 at col. 12:39–47).

Similarly, one disclosed embodiment contemplates readings taken at multiple periods, varying in length, depending on the concentration of glucose in the sample:

> Results are typically displayed at approximately 30 seconds after blood application when a blood glucose sample is being measured, although a 20 second reaction is permissible for glucose samples having a concentration of glucose of less than 250 mg/dl. *If other samples are being measured, suitable times for displaying the result may differ and can be readily determined from the characteristics of the reagent/sample selected.*

(PX–137 at col. 13:15–23 (emphasis added)).

In sum, the Court concludes that the record does not support Defendants' interpretation of "predetermined time" to mean a "specific" or "fixed amount of time." The Court's conclusion in this regard is consistent with its claim interpretation that "predetermined time" should be literally construed "as a time period determined in advance." (D.I. 423 at 5). Because Defendants' theory of prosecution history estoppel, i.e. that Plaintiff surrendered non-specific time methods, is inconsistent with the prosecution history of the patent, the specification of the patent and the disclosed embodiments of the patent, the Court concludes that Defendants are not entitled to judgment as a matter of law on the issue of prosecution history estoppel.

B. *Whether Substantial Evidence Supports The Jury's Finding That The Prestige Meters Infringe Claim 1 of the '487 Patent Under The Doctrine Of Equivalents*

Defendants next contend that the jury's finding that the Prestige meters infringe Claim 1 of the '487 Patent is not supported by substantial evidence. Specifically, Defendants argue that Plaintiff did not provide substantial evidence that (1) the Prestige meter performs in accordance with the predetermined time period and initiating steps required by Claim 1 (D.I. 447 at 17), and (2) the Prestige meter's out-of-meter testing infringes Claim 1. The Court will examine each of Defendants' arguments in turn.

1. Applicable law

■■■ An accused product that does not literally infringe upon the express terms of the patent may nonetheless be found to infringe if there is equivalence between the elements of the accused product and the claimed elements of the patented invention. *See generally Warner–Jenkinson,* 520 U.S. 17, 117 S.Ct. 1040, 137

L.Ed.2d 146 (1997). For there to be infringement under the doctrine of equivalents, the accused product or process must embody every element of a claim, either literally or by an equivalent. *Id.* at 41, 117 S.Ct. 1040. Thus, the mere showing that an accused device is equivalent overall to the claimed invention is insufficient to establish infringement under the doctrine of equivalents.

■■■ The primary inquiry in applying the doctrine of equivalents is whether "the differences between the claimed invention and the accused device are ... 'insubstantial.'" *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed.Cir. 1998). The determination of whether the differences between the claimed invention and the accused device are insubstantial involves the question of whether "the element of the accused device at issue performs substantially the same function in substantially the same way, to achieve substantially the same result, as the limitation at issue in the claim." *Id.* at 1016 (describing the "function/way/result" inquiry). To this effect, the United States Supreme Court has emphasized that the "particular linguistic framework used" is not important, so long as it addresses the "essential inquiry [of whether] the accused product or process contain[s] elements identical to or equivalent to each claimed element of the patented invention." *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040. The Court emphasized that "[t]he determination of equivalence should be applied as an objective inquiry on an element-by element basis." *Id.*

■■■ As a matter of policy, the purpose of the doctrine of equivalents is to prevent a device from being copied with minor changes and substitutions which would add nothing to the invention, but would be enough to take the copied device outside the precise language of a claim. *See Graver Tank & Mfg. Co. v. Linde Air Prods., Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). However, a broad

application of this policy may conflict with the statutory requirement that a patentee distinctly claim the invention covered by a patent. *Warner-Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040; *see also* 35 U.S.C. § 112. To temper this potential conflict and prevent the doctrine from expanding a patent's protection beyond the scope of its claims, the Federal Circuit has cautioned that application of the doctrine of equivalents should be "the exception ... [and] not the rule" in patent infringement actions. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed.Cir.1991).

The question of equivalence may be decided by a jury. However, the Federal Circuit has recognized that the doctrine of equivalents, though simple to articulate, is conceptually difficult to apply. To reduce the risk of jury confusion over the doctrine, the patentee must present "particularized testimony and linking argument" as to why the function, way and result of each element in the accused devise is substantially the same as the elements of the claimed invention. Generalized testimony concerning the similarities between the claims and the accused device and evidence or argument subsumed in a plaintiff's case of literal infringement are insufficient to establish infringement under the doctrine of equivalents. Rather, a plaintiff must "articulate the comparison" between the claimed elements and the elements of the accused device and present "substantial evidence" comparing the claimed elements and the accused device in each of the three aspects of equivalency, i.e. the function, way, and result inquiry. *See Malta v. Schulmerich Carillons, Inc.,* 952 F.2d 1320, 1329 (Fed.Cir.1991); *Lear Siegler v. Sealy Mattress Co. of Mich.,* 873 F.2d 1422, 1427 (Fed.Cir.1989).

2. Whether the Prestige meters perform in accordance with the predetermined time period step required by Claim 1 of the '487 Patent

The fifth element, also known as step (e) or element (e), recited in Claim 1

of the '487 Patent is "initiating said predetermined time period upon a predetermined drop in reflectance sufficient to indicate that said sample has reached said first surface." In arguing that insufficient evidence supports the jury's finding that the Prestige meters include the equivalent of a predetermined time period as set forth in this step, Defendants contend that (1) Plaintiff failed to provide "particularized testimony" and "linking argument" to support an equivalents finding; (2) the jury's finding of infringement removes the predetermined time period limitation from the claim; and (3) the Prestige meters do not operate in accordance with the "role" of the predetermined time period.

In response to Defendants' argument, Plaintiff contends that sufficient evidence was presented from which the jury could have found that step (e) was present, either literally or under the doctrine of equivalents. Because the jury was not required to specify which elements it found literally present and which elements were found equivalently present, Plaintiff further contends that if sufficient evidence existed for the jury to find this element was literally present in the Prestige meters, then the Court need not reach the issue of whether sufficient evidence existed for the jury to find that this element was equivalently present in the Prestige meters. *See Comark Communications, Inc.,* 156 F.3d at 1188–89 (Fed.Cir.1998) (holding that where jury did not indicate which elements were met literally and which were met equivalently, and substantial evidence existed from which the jury could have found the limitation literally, court need not find substantial evidence and linking testimony of equivalents with respect to that limitation). The Court will examine the parties' arguments in turn.

a. Whether step (e) is literally present in the Prestige meters

After reviewing the evidence presented on the question of literal infringement as it relates to step (e), the Court acknowledges that the question of whether substantial

evidence supports a finding that step (e) was met literally in the Prestige meters is a "close call." Nevertheless, after review of the testimony, the Court concludes, as a matter of law, that insufficient evidence was presented from which the jury could have concluded that step (e) was literally present in the Prestige meters. Although both of Plaintiff's liability experts, Dr. Smith and Mr. Kramer, testified about the operation of the Prestige meter, the Court finds their testimony to be conclusory and unclear on the issue of a predetermined time period. For example, both experts testified that the Prestige meter operates using five second intervals and that this is a predetermined time period; however, neither expert provided a thorough explanation of his opinion which integrated the precise claim language, the Court's interpretation of that language and the operation of the Prestige meter. Further, Mr. Kramer's testimony undercut in some respects his opinion that the Prestige meter operates according to a predetermined time period. For example, Mr. Kramer testified:

> Q: And you agree that it is not known before the test begins with the Prestige device at which of these five second intervals the result will be displayed, correct?
> A: Are we still talking about the 070 version?
> Q: In either one.
> A: Either one? It is correct that the readings will be taken every five seconds, and we cannot determine which of those five seconds will produce the result that will be displayed to the user.

(Tr. 950:7–18). To this extent, Mr. Kramer's testimony suggested that the Prestige meter does not use a time period determined in advance. Given the conclusory and contradictory nature of the testimony of Plaintiff's experts, the Court cannot conclude that sufficient evidence was presented to support a conclusion that step (e) literally reads on the Prestige meter. Accordingly, the Court concludes that insufficient evidence was presented, as a matter of law, to support a conclusion that step (e) is literally present in the Prestige meter.

b. Whether the equivalent of step (e) is present in the Prestige meters

If insufficient evidence exists to support the conclusion that step (e) is literally present in the Prestige meters, then the jury's verdict can only be supported if Plaintiff met its burden under the doctrine of equivalents of presenting particularized testimony and linking argument as to why the function, way and result of the Prestige meter's operation is substantially the same as that claimed in element (e) of the '487 Patent. After reviewing the testimony of Plaintiff's experts and the argument presented by counsel, the Court concludes that Plaintiff failed, as a matter of law, to present the particularized testimony and linking argument required to support a verdict of infringement under the doctrine of equivalents. Mr. Kramer's testimony on equivalents is particularly vague in that he appears to rely on the language of the '487 Patent for his conclusion that the Prestige meter operates in the same manner as the '487 Patent, without explicitly explaining how the function, way and result of step (e) is present in the device.[3] Indeed, Dr. Smith's testimony is even more vague than Mr. Kramer's testimony. In fact, Dr. Smith never articulates a function, way, result analysis with respect to step (e). (Tr. 725–730). Lastly,

3. Although Mr. Kramer appears to address the function, way and result of step (e) in his testimony, Mr. Kramer's testimony appears to pertain only to the language of the '487 Patent. In other words, Mr. Kramer does not, in the Court's view, apply his analysis to the Prestige meter to show how the Prestige meter operates in an equivalent manner. Mr. Kramer's testimony on equivalence is as follows:

Q: What's the function of Step E of claim one?
A: To initiate—to indicate that the sample has reached the bottom surface.
Q: And is there evidence indicating this to you?
A: The fact that the reflectance drops below the threshold indicates that it has.
Q: And what's the way step E is performed?

in evaluating the closing argument of Plaintiff's counsel, the Court finds that Plaintiff's argument regarding the doctrine of equivalents as it pertains to step (e) is subsumed within his argument for literal infringement. For example, Plaintiff's counsel sets forth an equivalence argument which is separate and distinct from his arguments concerning literal infringement for the step requiring a dry first reflectance reading in the out-of-meter use of the Prestige meter (Tr. 2592:3–2593:7). However, with regard to step (e), Plaintiff's counsel does not raise a separate and distinct equivalence argument. (Tr. 2602–2606). Accordingly, the Court concludes, as a matter of law, that insufficient evidence exists to support a conclusion that step (e) is present equivalently in the Prestige meters.

### c. Summary

Because the Court finds that insufficient evidence exists to support a conclusion that step (e) is either literally present or present by equivalents in the Prestige meter, the Court concludes that insufficient evidence exists to support the jury's verdict that the Prestige meters infringe Claim 1 of the '487 Patent under the doctrine of equivalence. Accordingly, Defendants' Motion For Judgment As A Matter Of Law will be granted on this issue.

3. Whether substantial evidence supports the jury's verdict that out-of-meter testing infringes Claim 1 of the '487 Patent under the doctrine of equivalents

In arguing that substantial evidence does not support the jury's verdict

that the out-of-meter application use of the Prestige meter infringes Claim 1 of the '487 Patent under the doctrine of equivalents, Defendants contend that (1) the Court erred in its claim construction that the term "porous reflectance-reading matrix located in said [reflectance-reading] device" did not require the porous matrix to be in the meter when the sample is applied; (2) the dry reflectance reading step of Claim 1 is not literally or equivalently present with out-of-meter use; (3) out-of-meter application use of the Prestige meter does not perform the applying step of Claim 1; and (4) out-of-meter application use of the Prestige meter does not perform the "properly construed" initiating step of Claim 1.

The initiating step is part and parcel of element (e), which the Court has previously concluded is not met in the Prestige meters either literally or under the doctrine of equivalents. Accordingly, the Court concludes that substantial evidence does not support the jury's verdict that the out-of-meter testing use of the Prestige meter infringes Claim 1 of the '487 Patent under the doctrine of equivalents. However, in order to provide a complete analysis of those issues raised in the context of evaluating whether substantial evidence supports the jury's verdict of infringement under the doctrine of equivalence, the Court will address below the remaining arguments raised by Defendants.

### a. The Court's Claim Construction

Following extensive *Markman* briefing by both parties and a lengthy *Markman*

A: By taking reflectance reading from the bottom surface.
Q: And is there evidence indicating to you that this is the function of Step E.
A: Yes.
Q: And what is that?
A: Step E itself saying that initiating said predetermined time period on a predetermined drop in reflectance sufficient to indicate that said sample has reached said first surface.
Q: And what's the result of Step E?

A: The result of Step E is that its determined that the surface, the bottom surface had been wetted, and that the following step can be initiated
Q: And is there evidence indicating to you that this is the result of step E.
A: Yes. Again, in reading this, initiating said predetermined time period upon a predetermined drop in reflectance sufficient to indicate that said sample has reached said first surface. (Tr. at 925:18–927:12).

hearing, the Court concluded that the term "porous, reflectance-reading matrix located in said [reflectance-reading] device" does not require that the porous matrix be in the meter when the sample is applied. In reaching this conclusion, the Court declined to read limitations from the preferred embodiment or specification into the claims of the patent. (D.I.423).

■■■■ To the extent that Defendants challenge the Court's claim construction, the Court rejects Defendants' argument. A motion for judgment as a matter of law is not the proper vehicle in which to seek reargument of the Court's claim construction. Moreover, reargument is only appropriate in three circumstances: (1) where the court has patently misunderstood a party, (2) where the court has made an error not of reasoning, but of apprehension, or (3) where the court has made a decision outside the scope of the issues presented to the court by the parties. *Pirelli Cable Corp. v. Ciena Corp.*, 988 F.Supp. 424, 445 (D.Del.1997) (citations omitted). Defendants have not alleged any of these circumstances and simply contend that the Court's claim construction is legally incorrect. Accordingly, the Court declines to revisit its claim construction rulings and rejects Defendants' argument that substantial evidence does not support the jury's verdict of infringement to the extent that it is premised on an alleged error in the Court's claim construction.

b. The First Reflectance Reading Step

Element (a) of the '487 Patent requires taking a first reflectance reading from a dry first surface of the porous matrix. The jury's finding that the out-of-meter application technique utilized by the Prestige meter infringes Claim 1 of the '487 Patent requires the Court to assume that at least one element of the claim was not literally met in the Prestige meter. *Comark*, 156 F.3d at 1189, n. 3.

While the evidence may not have been sufficient for the jury to conclude that this element was literally met by the Prestige meter, the Court concludes that Plaintiff presented substantial evidence from which the jury could have concluded that the equivalent of a dry first reflectance reading is taken when the Prestige meter is used with the out-of-meter blood application technique. For the doctrine of equivalents to apply, the element of the accused device at issue must perform substantially the same function, in substantially the same way, to achieve substantially the same result, and the patentee must present particularized testimony and linking argument to this effect. *Dawn*, 140 F.3d at 1014. With respect to element (a), the Court concludes that Plaintiff presented particularized testimony and sufficient linking argument that the out-of-meter application use of the Prestige meter takes at least the equivalent of a dry first reflectance reading. For example, Plaintiff's witness, Dr. Louder testified that Defendants programmed threshold reflectance values in the Prestige meter which correspond to wet and dry test strips. Dr. Smith then explained how these values are utilized so that the out-of-meter technique involves the equivalent of step (a). Dr. Smith explained that "because of quality control procedures that are performed at HDI [it is known] that each strip will have a reflectance above 75 percent in order to pass the quality control procedures. Therefore, the reflectance of the strip is known as if it had been measured." (Tr. at 724:14–21). According to Dr. Smith, the requirement of step (a) is "to know that there has been a sufficient drop in reflectance to indicate that the sample has reached the bottom surface" and to one skilled in this area, knowing what the reflectance was by the manufacturing process and the quality assurance procedures is the equivalent of making that measurement of each strip within the meter. (Tr. at 725:7–14). In rendering his opinion that the equivalent of a dry first reflectance reading is taken by the Prestige meter when the out-of-meter application technique is used, Dr. Smith further explained:

A. ... You have to either take that first reflectance reading, or perform the equivalent of it. If you perform the same function in the same way, and you wind up with the same result, then you have the equivalent of it.

The function that we're performing here is to determine the reflectance from a dry strip. The way we do that, the way the meter does that is by measuring the reflectance of a dry strip, and the result is that the reflectance of the dry strip is known.

(Tr. at 726:3–13). Having established the function, way and result of step (a), Dr. Smith explained that the equivalent of this is done with the out-of-meter testing technique:

[I]f the quality control procedures are followed, then the dry reflectance of the test strip is measured and it is—the dry reflectance is determined and the same function result—the same result is obtained, which is knowing the reflectance of a dry test strip.

Q. Which is what in this case?

A. Which in this case is in the high 80s or low 90–percent reflectance.

Q. In any event, above 75 percent?

A. Certainly, in order to pass the quality control procedures, it must be above the 75 percent, above the threshold.

(Tr. at 726:16–727:5; see also PX–1034 at ¶ 6(a).)

In addition to the testimony of Mr. Louder and Dr. Smith, Plaintiff's witness Mr. Kramer also testified that the Prestige meter performs the equivalent of step (a) when used with the out-of-meter blood application technique. Mr. Kramer explained that the Prestige meter measures the reflectance of an undersurface of an inserted test strip at intervals to determine whether the reflectance has dropped below a 70% threshold (PX–1031 at ¶ 8). The 70% threshold is programmed into the Prestige meter, because the Defendants knew that the reflectance value of a dry, unreacted Prestige strip would always be

greater than 70% and 70% would correspond to the value of a test strip wetted with blood. (PX–1031 at ¶ 9). Consistent with Dr. Smith's testimony, Mr. Kramer explained that quality control procedures carried out by HDI during the manufacture of the Prestige strips will confirm that the dry reflectance value of every Prestige strip will be above the 70% threshold:

Q: Mr. Kramer, have you considered deposition testimony of Mr. Carrol in reaching your conclusion on infringement?

A. Yes, I have. And again, here he was apparently the quality control person, and he tested a number of strip material—well, he quality controlled the material as it left the factory, and he told exactly how many tests he took from each strip and all that sort of thing.

And his indication was that nothing below 70 percent would ever get into the marketplace.

(Tr. at 934:4–14, 873:9–22; 876:21–880:20 & PX–1031 at ¶ 10). Mr. Kramer concluded that utilizing strip material that will result in the test strips having a dry reflectance value greater than 70%, as Defendants do through their quality control testing, is the equivalent of measuring the reflectance of each test strip before the blood sample is applied, as is required by step (a). Stated another way, the function of step (a) is to determine the reflectance of a dry test strip, the way this is done is by measuring the light reflected from a dry test strip, and the result is the obtaining of an initial, dry strip reflectance value. (PX–1031 at ¶ 12). Mr. Kramer opined that there is no substantial difference between taking an actual dry reflectance reading of a strip in the meter during a test and confirming the dry reflectance of the strips through quality control testing at the factory. According to Mr. Kramer, one skilled in the art would understand that Defendants' method of determining the dry reflectance value of their strip and programming into the meter a reflectance

threshold based on this dry reflectance value is interchangeable with the step of taking a dry reflectance value of each test strip in the meter itself.

In addition to this evidence, the Court concludes that Plaintiff's counsel also provided sufficient linking argument during his closing argument. For example, Plaintiff's counsel explained to the jury with respect to step (a):

> [W]e see here insert the strip, and these are the dry reflectance readings up here which are taken. Now the same is true that a dry reflectance is taken in the out-of-meter use, and we mentioned that yesterday during Dr. Smith's testimony. It's that dot [sic done] right up here. And what that dot is indicating is a reflectance reading which is taken by— in essence taken by the defendants back at the factory.
>
> You may remember Mr. Carroll's testimony saying that yes, they do do a lot of quality control testing on these strips and they make sure the strips have reflectances between 86 and 92. And that—and we saw that in Dr. Bell's chart where he brought strips in which was a more typical 89 percent value, so that they knew the reflectances of the strips because they've taken them.
>
> This is an equivalence of taking the reading right in the meter to start with, of course, because it's done elsewhere, but in method what we're looking at is not as you will hear from the Court that every step of the method has to be done in the meter, but some steps or their equivalence can be done elsewhere as long as they're done. And that's what happens in the out-of-meter situation. They do it back at the factory in essence and then they start knowing this has a dry reflectance of 89 or 90, actually somewhere between 86 and 92.

(Tr. at 2591:24–2593:7). Because the Court finds that Plaintiff presented sufficient testimony and linking evidence that the out-of-meter application use of the Prestige meter performs the equivalent of a dry first reflectance reading, the Court will deny Defendants' Motion For Judgment As A Matter Of Law on this issue.

### c. The Applying Step

Defendants' next contend that the out-of-meter application use of the Prestige meter does not perform the applying step of Claim 1 of the '487 Patent. Defendants' argument in this regard is premised entirely on Defendants' contention that the Court improperly construed the term "porous, reflectance-reading matrix located in said [reflectance-reading] device" to mean that "the porous matrix need not be in the meter when the sample is applied." (D.I. 423 at 7). For the reasons discussed previously, the Court declines to revisit its claim construction. Accordingly, the Court rejects Defendants' argument that the Prestige meter does not perform the applying step of Claim 1 and denies Defendants' motion for judgment as a matter of law on this issue.

### 4. Summary

In sum, the Court concludes that insufficient evidence supports the jury's verdict that the out-of-meter application use of the Prestige meter infringes Claim 1 of the '487 Patent under the doctrine of equivalents. While the Court rejects Defendants argument that the Court erred in its claim construction and rejects Defendants' arguments that the out-of-meter use of the Prestige does not perform the dry first reflectance reading and the applying step, the Court agrees with Defendants argument that Plaintiff's failed to establish that step (e) was literally or equivalently present in the Prestige meters. Accordingly, the Court concludes that Defendants are entitled to a judgment of non-infringement as a matter of law.

## II. *Defendants' Motion For Judgment As A Matter Of Law On The Issue Of Validity*

In moving for judgment as a matter of law on the issue of validity, Defendants

challenge the jury's verdict that the '487 Patent is valid. Specifically, Defendants contend that they presented clear and convincing evidence that the '487 Patent is invalid as anticipated by the Garcia invention and/or the Garcia '398 Patent. In addition, Defendants contend that they presented clear and convincing evidence that Claim 1 was obvious over the combination of the Jessop '566 Patent and the Ektachem DT–60 analyzer. The Court will address each of Defendants' arguments in turn.

A. *Whether Substantial Evidence Supports The Jury's Conclusion That Claim 1 of the '487 Patent Is Not Invalid as Anticipated by the Garcia Invention and/or the Garcia Patent*

1. Applicable law

■ As a general matter, for a patent to be invalid as anticipated under 35 U.S.C. § 102(g), the party challenging validity must show that the potentially invalidating patent or invention (1) qualifies as prior art; (2) was not abandoned suppressed or concealed; and (3) is identical to the claimed invention or process. In order for a potentially invalidating invention to qualify as prior art, the party challenging validity must show that the potentially invalidating invention or patent has priority over the claimed invention. *See e.g., Thomson S.A. v. Quixote Corporation,* 166 F.3d 1172, 1175 & n. 3 (Fed.Cir.1999).

■ To show identicality between prior art and the claimed invention, the party challenging validity must show that each and every step or element of the claimed process or invention is disclosed in a single prior art reference or embodied in a single prior art device or practice, either expressly or inherently. *Hazani v. United States International Trade Commission,* 126 F.3d 1473, 1477 (Fed.Cir.1997). For an element to be inherent in a prior art reference it must necessarily be present in the reference. *Continental Can Co. v. Mon-*

*santo Co.,* 948 F.2d 1264, 1268 (Fed.Cir. 1991). As the Federal Circuit has explained:

> Inherency may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient.

*Monsanto,* 948 F.2d at 1268–1269. Whether a step or element is inherent in a prior art reference is a question of fact. *Hazani,* 126 F.3d at 1477.

■ A jury's verdict of patent validity, indicates that the jury found that no prior art reference completely embodied the method or apparatus of the claims at issue. Harmon, *supra* § 3.2 at 81. Absent special interrogatories, it is presumed from a general verdict of patent validity, that the jury found differences between the claimed inventions and the prior art. *Id.* In reviewing a jury's verdict that a patent is not anticipated, the court must uphold the verdict if a reasonable jury could find that one or more elements of the patent claims are not found in the purportedly anticipatory reference. *See Hazani,* 126 F.3d at 1477; *Mycogen Plant Science, Inc. v. Monsanto Co.,* 61 F.Supp.2d 199 (D.Del.1999).

1. Whether the Garcia invention and/or the Garcia '398 Patent qualify as prior art

■ In arguing that the jury's conclusion of validity was erroneous as a matter of law, Defendants contend that the Garcia references have priority over the invention claimed in the '487 Patent. Specifically, Defendants contend that Garcia conceived of and diligently reduced to practice his invention by August 1984. In response, Plaintiff contends that Defendants failed to establish that Garcia completed his in-

vention by August 1984. Plaintiff further contends that it reduced its invention to practice by March 1, 1985, prior to any reduction to practice of the Garcia invention and prior to the July 25, 1986 filing date of the Garcia '398 Patent.

In explaining the concept of priority under Section 102(g), the Federal Circuit has explained that "[p]riority goes to the first party to reduce an invention to practice unless the other party can show it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir. 1993). Thus, priority involves two components, conception and reduction to practice. Conception is defined as "the formation in the inventor's mind of a definite and permanent idea of the complete and operative invention, as it is to be applied in practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1326 (Fed.Cir.1998). Reduction to practice may be either constructive or actual. A constructive reduction to practice occurs when a patent application is filed. *Id.* An actual reduction to practice occurs when the inventor (1) constructs a product or performs a process that is within the scope of the claimed invention; and (2) demonstrates that the invention actually worked for its intended purpose. *See Cooper*, 154 F.3d at 1327; *Estee Lauder Inc. v. L'Oreal S.A.*, 129 F.3d 588, 593 (Fed.Cir. 1997). The party challenging validity bears the burden of establishing priority by clear and convincing evidence.

While the Court believes it is questionable whether Garcia actually reduced his invention to practice by August 1984, the Court concludes that the evidence presented by Defendant was sufficient to demonstrate by clear and convincing evidence that Garcia conceived of the invention by August 1984, and thereafter, diligently worked to reduce that invention to practice in the form of the NovoCheck meter. Mr. Garcia testified that he was diagnosed with diabetes in the early to mid 1970's. As his condition worsened and required more frequent monitoring of his blood glucose levels, Mr. Garcia testified that he became interested in designing his own blood glucose monitor. He further testified that his designing of the monitor began in 1980, after interviewing numerous doctors, nurses and diabetic patients. (Tr. at 1458–1459). It is evident from Mr. Garcia's testimony, that he understood the problems with the then current technology for blood glucose monitoring, and that his idea was to create a pocket-size device which did not require the user to wipe the blood sample and which utilized an automatic timing process. (Tr. at 1462–1462). Mr. Garcia testified that between late 1983 and June 1984, he developed detailed flow charts for the timing function of the meter and built breadboards demonstrating his idea. Mr. Garcia's testimony concerning the date of the breadboards and diagrams demonstrating and illustrating his ideas was corroborated by the dates written on many of the materials. (Tr. at 1478–1488). Using his diagrams and drawings, Mr. Garcia explained the pertinent aspects for his invention. For example, with regard to his idea for a no-wipe testing strip, Mr. Garcia testified that blood would be applied to the first side of the strip and the red blood cells would be filtered out as the blood traveled by capillary action to the second side where the blood would react with chemicals and readings would be taken. Mr. Garcia testified that he constructed his filters out of a variety of materials, including Kleenex, coffee filters, and blotter paper, and that he would place these filters on top of store-bought glucose test strips. (Tr. at 1482–1483; 1492, 1505–1506).

Mr. Garcia also testified regarding his ideas for utilizing an automatic timer for taking glucose measurements. Using his diagrams and drawings, Mr. Garcia testified that once the blood is applied to the strip, the sugar in the blood would react with the chemistry to change color. (Tr. at 1486). He further testified that this color change started the timing automati-

cally, and after the timing was complete, a computer programmed with tables would display how much sugar was in the blood. (Tr. at 1483–1485; 1487–88, 1493, 1496). The workings of Mr. Garcia's timing system were illustrated in a document dated August 1984. (DX–397).

Mr. Garcia's testimony concerning his work on the invention was also corroborated by Art Kydd, a member of the Board of Directors of AudioBionics, Garcia's employer. Although Kydd could not remember specific details, he confirmed that from 1982 to 1984 he knew that Garcia was working on the blood glucose meter and that Garcia had shown and explained to him a number of drawings.

In September 1984, Mr. Garcia presented his ideas to George Reed, who was being interviewed to become Chief Executive Officer of AudioBionics. Mr. Reed liked Mr. Garcia's ideas and suggested that he present his ideas to the Board of Directors. The minutes of an October 15, 1984 meeting corroborate Mr. Garcia's testimony that he presented his idea for a new portable blood glucose monitor to the Board of Directors. Art Kydd confirmed Mr. Garcia's testimony that the Board subsequently approved the project (Tr. at 1580–1581).

By September 1984, Garcia began to form a project team. Mr. Linde, a member of the project team, testified that his first assignment during this time period was to miniaturize the components of Garcia's idea so that it would fit into a pen-like device. (Tr. at 168). Status reports indicate that work on the project continued through the summer of 1985. (DX 74). By the fall of 1985, a number of different commercial prototypes had been developed. (Tr. at 1909–1910). Monthly project status reports evidence that work continued from November 1985 to June 1986. On July 25, 1986, Garcia and his co-inventors filed the patent application which eventually issued as the Garcia '398 Patent.

Realizing that it needed a major company to assist it in its marketing efforts, Mr. Garcia's company formed an alliance with Novo Industries. This alliance resulted in the NovoCheck meter, which utilized Garcia's technology. The NovoCheck meter was publicly demonstrated in September 1987. (Tr. at 1917–1918).

Plaintiff contends that the Garcia invention and the Garcia '398 Patent do not qualify as prior art, because Garcia abandoned his idea for using a hollow needle to transport blood from the patient's finger to a chemical reagent, a concept that Mr. Garcia called the "Mosquito." While it is true that the blood delivery aspect of Garcia's invention changed during his work on the project, the Court finds this insufficient to undercut Defendants' evidence of conception and diligent reduction to practice. Documentary evidence and testimonial evidence presented by Defendants support their assertion that the central aspects of the invention, like the timing method conceived of by Garcia, did not change. (Tr. at 1906, DX 87).

In returning a verdict that the '487 Patent was not invalid, the jury was not required to indicate whether their verdict rested on a finding that the Garcia invention and the Garcia '398 Patent were not prior art or on a finding that the Garcia invention and Garcia '398 Patent were distinct from the '487 Patent. However, for purposes of responding to the issues raised by Defendants motion for judgment as a matter of law, the Court concludes that sufficient evidence existed from which the jury could have concluded that Defendants established, by clear and convincing evidence, that Garcia conceived of his invention by August 1984 and diligently worked to reduce that invention to practice in the form of the NovoCheck meter. Accordingly, the Court concludes that the Garcia invention and the Garcia '398 Patent qualify as prior art for the purposes of determining whether Claim 1 of the '487 Patent was anticipated by these references.

Although the Court concludes that the Garcia invention and the Garcia '398 Patent qualify as prior art, the jury's ultimate verdict of validity would still be supported if sufficient evidence existed for the jury to find differences between the '487 Patent and the Garcia invention and the Garcia '398 Patent. Accordingly, the Court must examine whether a reasonable jury could have found differences between these prior art references and the '487 Patent.

2. Whether there is identicality between the prior art of the Garcia invention and/or the Garcia '398 Patent and Claim 1 of the '487 Patent

Assuming that the Garcia invention and the Garcia '398 Patent qualify as prior art, the Court concludes that a reasonable jury could have concluded that Claim 1 of the '487 Patent is distinct from the Garcia invention and the Garcia '398 Patent. Claim 1 of the '487 Patent discloses a method which utilizes "a predetermined drop in reflectance sufficient to indicate that said sample has reached said first surface" to initiate the predetermined time period. However, unlike Claim 1 of the '487 Patent, both Mr. Garcia and his co-inventor, Mr. Linde, testified that the Garcia invention utilized a chemical change in order to initiate the timing period. Specifically, both Mr. Garcia and Mr. Linde testified on direct and cross-examination that the timing in the Garcia invention was initiated by the reaction of glucose in a blood sample with chemicals in a test strip, i.e. a chemical change which results in a color change.[4] (Tr. 1487:3–6; 1540:2–9; 1630:7–10, 1631:11–1632:5).

In addition to the testimony of Mr. Garcia and Mr. Linde, the jury also heard evidence that the patent examiner who examined the '487 Patent considered the work of Mr. Garcia and his co-inventors, yet allowed the '487 Patent claims. (Tr. at 1385:16–20). The fact that the PTO allowed the '487 Patent after expressly considering the Garcia reference constitutes evidence that the '487 Patent was not anticipated by this reference. *See Hewlett–Packard v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990); *LNP Engineering Plastics, Inc. v. Miller Waste Mills, Inc.*, 77 F.Supp.2d at 553. Accordingly, the Court concludes that substantial evidence existed from which a reasonable jury could have concluded that Defendants failed to prove identicality between the '487 Patent and the Garcia invention.

Similarly, with regard to the Garcia '398 Patent, the Court concludes that a reasonable jury could have concluded that Defendants failed to establish by clear and convincing evidence that each and every element of Claim 1 of the '487 Patent was disclosed or embodied in the Garcia '398 Patent. Defendants did not present any testimony to the jury comparing the disclosure of the '398 Patent to Claim 1 of the '487 Patent. Indeed, the testimony that was presented to the jury highlighted the differences between the '398 Patent and Claim 1 of the '487 Patent. For example, Defendants' expert witness, George Scherer pointed out that, unlike the '487 Patent which utilizes a drop in reflectance to initiate the timing period, the Garcia '398 Patent utilizes the firing of a lance to initiate the timing period. For example, Mr. Scherer testified at trial as follows:

Q: In Garcia '398, it's true, isn't it, that an internal timer is started as a result of firing of a lance?

A: That's true. That's what's stated in the patent.

4. In discussing the Garcia '398 Patent, the testimony of Mr. Garcia and Mr. Linde concerning the Garcia invention was confirmed by Defendants' expert witness, Mr. Scherer. On redirect examination by Defendants' counsel, Mr. Scherer testified that according to the Garcia '398 Patent, the Garcia invention was concerned with the detection of a chemical color change, rather than a detection of a physical change like wetting. (Tr. at 1899:12–21).

Q: And in Garcia '398, it's also true that a timer started by the firing of the lance is a switch triggered by the puncture device?

A: That's what's shown in the patent yes. Or described in the patent.

(Tr. at 1853:11–20). Indeed, Mr. Scherer agreed that the Garcia '398 Patent could essentially be "described as one with a clock that's started by the puncturing device, which tells the rest of the system when to take measurements at specified intervals." (Tr. at 1868:1–7). Mr. Scherer's testimony on this point was consistent with his deposition testimony (Tr. at 1866:14–1867:22) and his testimony on re-direct examination.

For example, on redirect examination by Defendants' counsel, Mr. Scherer again testified that the timer is started when the lance is fired into the finger to create a blood sample, and it is this timer which begins the 60 second time period. (Tr. at 1897:4–24). Further, unlike Claim 1 of the '487 Patent which automatically starts the timing period upon a drop in reflectance, Mr. Scherer pointed out that in the Garcia '398 Patent, the user must fire the lance which begins the timing period. (Tr. at 1898:24). In addition, as the Court noted previously, the jury heard evidence that the patent examiner who examined the claims of the '487 Patent expressly considered the Garcia '398 Patent, as well as other patent applications filed by Garcia, and allowed the '487 Patent. *See Hewlett–Packard*, 909 F.2d at 1467; *LNP Engineering Plastics*, 77 F.Supp.2d at 553. Accordingly, the Court concludes that substantial evidence existed from which a reasonable jury could have concluded that Defendants failed to prove identicality between the '487 Patent and the Garcia '398 Patent.

### 3. Summary

In sum, the Court concludes that the weight of the evidence supports the jury's verdict that Claim 1 of the '487 Patent is not invalid as anticipated by either the Garcia invention or the Garcia '398 Patent. While the Court concludes that Defendants established by clear and convincing evidence that these reference qualify as prior art, the Court concludes that a reasonable jury could have concluded that Defendants failed to prove identicality between the '487 Patent and the Garcia invention and the Garcia '398 Patent. Accordingly, the Court concludes that sufficient evidence supported the jury's verdict of validity, and therefore, the Court will deny Defendants' motion for judgment as a matter of law that Claim 1 of the '487 Patent is invalid as anticipated.

### B. *Whether Substantial Evidence Supports The Jury's Conclusion That Claim 1 of the '487 Patent Is Not Invalid as Obvious*

#### 1. Applicable law

In pertinent part, 35 U.S.C. § 103 provides that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art ...", 35 U.S.C. § 103. Obviousness is a question of law which is predicated upon several factual inquiries. *Richardson–Vicks v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997). Specifically, in determining whether a patent is invalid as obvious over the prior art, the trier of fact must consider (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) other objective indicia of obviousness, such as commercial success, long felt but unsolved need, failure of others, and acquiescence of others in the industry that the patent is valid. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). As with invalidity based on anticipation, the party challenging validity on the grounds of obviousness must establish that the patents are invalid by clear and convincing evidence. *C.R.*

*Bard, Inc. v. M3 Systems,* 157 F.3d 1340, 1351 (Fed.Cir.1998).

## 2. The prior art

In arguing that the '487 Patent is invalid as obvious over the prior art, Defendants rely on the combination of three prior art references: (1) the Jessop Patent; (2) the Ektachem DT–60 analyzer and slides, and its operating documentation; and (3) the Garcia '403 Patent. Although Plaintiff does not challenge the Jessop Patent and the Ektachem DT–60 as appropriate prior art to consider in an obviousness inquiry, Plaintiff contends that the Garcia '403 Patent does not qualify as prior art. Plaintiff further contends that it is inappropriate for Defendants to rely on the Garcia '403 Patent, because Defendants did not relate to the jury a theory of obviousness which combined the Garcia '403 Patent with the other prior art references.

After reviewing the record on this issue, the Court agrees with Plaintiff's argument. Although Defendants' expert, George Scherer, rendered an opinion on obviousness based on the combination of the Jessop Patent and the Ektachem DT–60, he did not express any opinion on obviousness relating to a combination of these two patents with the Garcia '403 Patent. Indeed, Defendants do not point to, and the Court has not located, any record evidence which suggests that Defendants were relying on the '403 Patent in arguing obviousness. Because the jury was not presented with any evidence concerning a theory of obviousness based on the '403 Patent, the Court will not consider, in the context of a motion for judgment as a matter of law, Defendants' argument insofar as it relies on the '403 Patent. However, because Defendants relied on a combination of the Jessop Patent and the Ektachem DT–60 as prior art for its obviousness argument before the jury, and Plaintiff does not challenge these references as appropriate prior art references, the Court will consider Defendants obviousness argument insofar as it relates to a combination of the Jessop Patent and the Ektachem DT–60.

## 3. Differences between Claim 1 of the '487 Patent and the prior art

Having identified the prior art, the focus of the obvious analysis turns to identifying the differences between the claimed invention and the prior art. *Biacore v. Thermo Bioanalysis Corp.,* 79 F.Supp.2d 422, 462 (citing *Gardner v. TEC Sys., Inc.,* 725 F.2d 1338, 1345 (Fed.Cir. 1984)). Once the differences between the claimed invention and the prior art are ascertained, the question becomes "whether these differences are such that the invention as a whole would have been obvious to one of ordinary skill in the art at the time of the invention." *Id.*

In discussing the Jessop Patent and the Ektachem DT–60 as it related to obviousness, Defendants' expert, George Scherer, testified that, unlike the '487 Patent which utilizes a drop in reflectance to initiate the timing period, in the Jessop method a time period is started upon the application of a sample to a test slide. (Tr. at 1787:3–13). As for the timing method utilized by the Ektachem DT–60, Mr. Scherer gave contradictory testimony. On the one hand, Mr. Scherer testified that there was "basically no difference" between the timing method of the Ektachem DT–60 and the timing in Jessop. (Tr. 1784:14–17). Indeed, Mr. Scherer referred to the Ektachem DT–60 system as having been "taught by Jessop." (Tr. at 1788:4). To this effect, Mr. Scherer testified that the Ektachem DT–60 utilized a "spot" or "drop" detector which "look[s] at the slide from the top," meaning the same side to which the blood sample was applied, and once the sample is detected, a timer is started. (Tr. at 1779:12–1780:12; 1829:23–1830:3; 1832:6–11). On the other hand, Mr. Scherer testified that the Ektachem DT–60 utilized a drop in reflectance to start the timing. (Tr. at 1784:23–1785:1). In addition, Mr. Scherer pointed out that unlike the '487 Patent which takes its

readings from the bottom of the slide, the Ektachem DT–60 takes reading from the top of the slide.

Although Defendants presented the testimony of Mr. Scherer that it would have been obvious to one skilled in the art to combine the Jessop and Ektachem DT–60 references, Defendants did not offer any other evidence suggesting that one skilled in the art would have been motivated to combine these references to create the claimed invention. Indeed, record support for Defendants' obviousness argument is notably absent in Defendants' brief in support of their motion for judgment as a matter of law. Moreover, it should be further noted that neither the Jessop Patent (DX–44), nor two of the operating documents for the Ektachem DT–60 analyzer (DX 3, 4), were admitted into evidence for the jury's consideration. Given the evidence supporting the differences between the claimed invention and the prior art, and the lack of evidence offered by Defendants' to establish obviousness, the Court cannot conclude that the jury erred in concluding that Defendants failed to meet their burden of establishing invalidity by clear and convincing evidence.

### 4. Secondary considerations

 In addition to the preceding evidence, the record also contains evidence of secondary considerations related to nonobviousness. As the Federal Circuit has indicated, objective evidence of nonobvious must be considered before a conclusion of invalidity based on obviousness is made. *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1359 (Fed.Cir.1999). Indeed, the Federal Circuit has also recognized that evidence of secondary considerations " 'may be the most probative and cogent evidence in the record,' " as this evidence may " 'often establish that an invention appearing to have been obvious in light of the prior art was not.' " *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 957 (Fed.Cir.1997) (quoting *Stratoflex, Inc.*, 713 F.2d at 1538–1539).

However, secondary evidence of nonobvious is only pertinent if there is a nexus between such evidence and the merits of the claimed features of the invention. *WMS Gaming Inc.*, 184 F.3d at 1359; *Biacore*, 79 F.Supp.2d at 464. While the burden of establishing invalidity remains on the party challenging validity, the patentee bears the burden of establishing that a nexus exists between the evidence offered to show nonobviousness and the merits of the claimed invention. *WMS Gaming Inc.*, 184 F.3d at 1359.

In this case, the Court concludes that the evidence of secondary considerations provides support for the jury's conclusion that Defendants failed to carry the burden of proving invalidity on the grounds of obviousness. Both Plaintiff's witness Holly Kulp, and Defendants' witness, Fernando Garcia, testified that there was a long felt need in the diabetes field for a simpler, less, user-dependent method for diabetics to test their blood sugar levels at home. (Tr. at 318:2–319:24; 1460:18–1463:3). This long-felt need was also recognized by such organizations as the American Diabetes Association and the Center for Disease Control, who issued a joint statement with other relevant organizations emphasizing the importance of blood glucose monitoring to diabetics and the need for new monitoring systems which were less dependent on the user. (PX–653; Tr. at 321:3–23).

Further, evidence was presented which established that this long felt need was unsolved for quite some time, because other companies had failed in their efforts to develop a new monitoring system. For example, Defendants' witness David Chamberlain testified, that in 1984, Defendant MIT was still working on a user dependant system, which required the user to time the test by pushing a button and to remove blood sample from a test strip. (Tr. at 2253:16–2254:15). Similarly, Defendants' witness Fernando Garcia testified that although he recognized the need for a user-independent system, he and others at

his company were not able to bring an auto-time system called the Answer meter to market until 1990—three years after Plaintiff introduced its One Touch® system and four years after the application for the '487 Patent was filed. (Tr. at 1434:4–18; 2237:19–22).

In addition to the evidence of long-felt but unsolved need and the failure of others, the record also contains evidence of the commercial success of the Plaintiff's One Touch® system. On the first day that Plaintiff accepted orders for the One Touch® system, Plaintiff received as many orders as it typically had received in months for its prior wipe and time system. This influx of orders put the One Touch® system on back order for a year. (Tr. at 325:23–326:7). In addition, the success of the One Touch® system led Plaintiff to surpass its larger competitors like Boehringer Mannheim and Ames and become the number one company in blood glucose monitoring. (Tr. at 587:17–588:5; 594:21–595:20; PX–661).

In challenging this evidence of commercial success, Defendants contend that Plaintiff failed to show a nexus between the success of its product and Claim 1 of the '487 Patent. The Court disagrees with Defendants' assertion. To the contrary, Plaintiff presented evidence that the One Touch® system, which embodies the technology of the '487 Patent, was so successful because it eliminated user technique in both the areas of timing and wiping blood samples. (Tr. at 356:23–357:20; 362:10–16; 602:7–17). Plaintiff also presented evidence that others in the field recognized the advantages of the One Touch® system as a significant improvement over its competitors. For example, ECRI, an independent industry testing organization gave the One Touch® system its highest ranking because it offered a simpler procedure leading to more accurate results. (Tr. at 625:1–23; PX–665). In addition, evidence was presented that even Defendants recognized the significance of the One Touch® system, because Defendants relied on and worked from aspects of the One Touch® system in developing their Prestige meter. (Tr. at 798:12–816:19; 1225:14–15; 1286:17–1288:10; 1289:23–1290:5; 1290:21–1298:1; PX–117, PX–125, PX–126, PX–136, PX–138, PX–140, PX–490). Thus, the Court concludes that Plaintiff established a nexus between the commercial success of the One Touch® system and the invention claimed in the '487 Patent. Accordingly, the Court concludes that the evidence presented relating to secondary considerations of nonobvious supports the jury's conclusion of validity.

5. Summary

Given the secondary considerations supporting nonobviousness, the differences between Claim 1 of the '487 Patent and the prior art, and the lack of evidence offered by Defendants in support of their obviousness argument, the Court concludes that a reasonable jury could have concluded that Defendants failed to establish by clear and convincing evidence that the '487 Patent was invalid as obvious. Accordingly, the Court will deny Defendants' motion for judgment as a matter of law on the issue of invalidity due to obviousness.

**III. Defendants' Motion For A Partial New Trial**

Pursuant to Federal Rule of Civil Procedure 59, Defendants request a partial new trial on the issues of infringement under the doctrine of equivalents and invalidity. In support of their motion, Defendants raise four arguments: (1) Plaintiff improperly changed its claim construction contentions on the eve of trial, which severely prejudiced Defendants' ability to prepare for and try the case; (2) the jury's verdict is erroneous, because Defendants proved by clear and convincing evidence that the '487 Patent is invalid; (3) several of the Court's jury instructions on invalidity were erroneous as a matter of law; and (4) the jury's verdict is against the great weight of the evidence, because both the

in-meter and out-of-meter uses of the Prestige meters do not perform in accordance with the elements of Claim 1 of the '487 Patent. The Court need not address the issues of whether sufficient evidence supported the jury's verdict of validity and infringement, as the Court has already addressed these issues in the context of Defendants' Motion For Judgment As A Matter Of Law. However, for completeness, the Court will examine each of Defendants' remaining arguments in turn.

### A. Plaintiff's Position On Claim Construction

■ Defendants contend that Plaintiff improperly changed its claim construction on February 18, 1999, three weeks before trial, at the deposition of Plaintiff's primary expert witness, Dr. Smith. Specifically, Defendants contend that as of February 18, 1999, Plaintiff took the position that "in the initiation step, claim element (e), the requisite reflectance drop must be caused by 'wetting,' not by color change, and therefore, the case centered on the difference between looking for 'wetness' and looking for 'color' in a two-stage test." (D.I. 445 at 2). Defendants contend that prior to this date, Plaintiff had never taken the position that claim element (e) contained a limitation as to the cause of the predetermined drop in reflectance, and therefore, Defendants were unable to conduct discovery, properly brief the issue, and properly prepare witnesses to rebut Plaintiff's "wetness vs. color theory."

In response, Plaintiff contends that its position that the '487 Patent utilizes a drop in reflectance due to wetting to initiate a time period is found in the disclosures of the patent itself and the prosecution history of the patent. Moreover, Plaintiff contends that it clearly stated this position in connection with the September 25, 1998 *Markman* hearing in this case. Accordingly, Plaintiff contends that Defendants were not "sandbagged" by a new construction theory on the eve of trial.

In the alternative, Plaintiff contends that even if Defendants were "surprised" by the wetting issue, Defendants are not entitled to a new trial. Plaintiff contends that the Court gave Defendants a "more than fair" opportunity to present their position to the jury, so much so that it was Plaintiff's who were "sandbagged" by the introduction of newly disclosed expert reports and testimony. (D.I. 454 at 14–15).

The Court has reviewed the record as it pertains to this issue and concludes that, at least as early as the *Markman* briefing and hearing in this case, Plaintiff presented the position that the drop in reflectance was due to wetting. For example, in Plaintiff's opening Memorandum Re: Claim Construction, Plaintiff expressly stated that the time period is started as a result of the drop in reflectance due to wetting:

> Because the time period starts when sample wets the area where the measurement is to be taken (A210) rather than when sample is applied to the matrix, the accuracy of the analytical measurement is very good (A209–A210, see also A213).

(D.I. 143 at 47–48 (emphasis added)). In addition, remarks made by Plaintiff during the prosecution of the '487 Patent and cited by Plaintiff in its Memorandum Re: Claim Construction also suggest Plaintiff's position that the drop in reflectance was due to wetting:

> ... When a blood sample is applied to the strip, plasma penetrates through the reflectance pad and causes a decrease in the reflectance readings that are being taken at intervals on the bottom surface of the reagent pad. *When sufficient decrease occurs to indicate wetting of the bottom surface, the timing period is automatically initiated.*

(D.I. 143 at 9, citing A230–232 (emphasis added)).

> ... When a blood sample is applied to the strip, plasma penetrates through the reflectance pad and causes a decrease in reflectance readings that are being tak-

en at intervals on the bottom surface of the reagent pad. *The decrease in reflectance is mostly or entirely due to wetting of the surface . . . .*

(D.I. 143 at 40, citing A209–210 (emphasis added)).

Similarly, in its Reply Re: Claim Construction, Plaintiff expressly stated that the wetting of the matrix is responsible for initiating the timing period:

*It is not the reaction of analyte in the porous matrix that is used to initiate the timing, but rather, the wetting of the matrix that is used to initiate the timing period.*

(D.I. 159 at 11 (emphasis added)).

Consistent with its claim construction briefs, Plaintiff's counsel expressly addressed the issue of wetting as opposed to color development at the *Markman* hearing:

*In this way, LifeScan addressed one of the two problems. That is the problem of how to get rid of the wiping, but did not—had not yet addressed the problem of how to eliminate the timing requirements. And for the timing requirements, what it decided to do was take advantage of a phenomenon unrelated to color development, but a phenomenon which we're all familiar with at one degree or another. And that is the reflectance change which occurs to certain materials when they're wetted.*

This is—looks very much like a piece of paper, but happens to be a membrane of the kind that's described in the patent. Now, normally, as you can see, light reflects quite well off this membrane. It's white. And there's quite a high reflectance. That is a light that's hitting the front of this membrane is bouncing off.

*What LifeScan recognized is that when this membrane is wetted, and I'm using water from my cup, you will see, as we're all familiar that it gets darker.* That is, light which is now hitting the front of where I have wetted the mem-

brane is not bouncing back as much. In fact, what's happening is that some of that light is going through and out the other side of the membrane rather than bouncing back.

*And so that if you were measuring how much light was being reflected, that reflectance would be less.*

*LifeScan decided to use that phenomenon as a way to get rid of the manual timing requirement which had been a problem in products prior to this.*

(Ex. 3 to D.I. 454 at 14:19–15:24 (emphasis added)). To this effect, Plaintiff's counsel pointed out, that one of the desired objectives of Plaintiff's invention, as set forth in the abstract of the patent, is "to provide a timing circuit which is triggered by an initial decrease in reflectance *by the wetting* of the surface whose reflectance is being measured by the fluid which passes through the inert matrix." (Ex. 3 to D.I. 454 at 20:6–11, emphasis added). Using an animation to explain the difference between a drop in reflectance caused by wetting and a drop in reflectance caused by color development, Plaintiff's counsel further explained:

As a result, *what LifeScan realized— and what we'll be talking about a great deal about today—is that it could use the drop in reflectance or the change in reflectance stemming from the initial wetting of the strip in order to kick off the rest of the sequence* that the meter was going to use in order to eventually determine the amount of glucose that was to be measured.

And it filed—it developed this—reduced it to practice, filed the patent application on this. And that is the patent application that matured into the '487 patent that brings us here today.

(Ex. 3 to D.I. 454 at 17:4–15).

Given Plaintiff's articulation of its position in its *Markman* briefs and at the *Markman* hearing, Defendants should have been aware, at least as early as the *Markman* briefs and *Markman* hearing,

of Plaintiff's position that the drop in reflectance was due to wetting. Indeed, it appears from statements made and references cited by Defendants counsel both in their *Markman* briefs and at the *Markman* hearing that Defendants understood that Plaintiff's position was that the drop in reflectance is caused by wetting. In their claim construction brief, Defendants state:

> ... Sample is then applied to one surface of the porous matrix and travels to another measuring surface. *The arrival of the sample at the measuring surface causes the reflectance to decrease.* Reflectance readings are taken from the measuring surface after the blood is applied to the application surface to detect this decrease in reflectance. The method uses a predetermined drop in reflectance determined from a comparison between the *wet* and dry readings to initiate a predetermined incubation period.

> \* \* \* \* \* \*

The prior art of record includes several patents related to the use of reagent strips. For example, it was well known that the light reflectance of a reagent strip decreases as it became wet due to sample addition. *As LifeScan admitted during the prosecution of the '487 patent, this is as simple as recognizing that wet paper is less reflective than dry paper.*

(D.I. 148 at 6, 14, citing B95 (emphasis added)). Similarly, at the *Markman* hearing, Defendants counsel apparently recognized that the prosecution history of the patent discusses a drop in reflectance due to wetting. Defendants' counsel argued:

> Again, the prosecution history, it states, *the difference in reflectance caused by wetting of the matrix after migration of liquid through the matrix initiates the timing period of the present invention.*

(Ex. 3 to D.I. 454 at 110:15–19 (emphasis added)).

However, even if Defendants were unaware of Plaintiff's position until February 18, 1999, as they contend, the Court concludes that a new trial is not warranted because Defendants were given ample opportunity to present their position before the jury. For example, the Court permitted Defendants to introduce the expert testimony of Dr. Bell concerning studies he conducted to determine whether the initial drop in reflectance in the Prestige strips was due to wetting or color. The Court allowed this testimony, even though Defendants had not provided Plaintiff with an expert report on this testimony. In addition, the Court allowed Defendants to present a chart and photographs which were not disclosed to Plaintiff prior to trial, even though they had been completed at that time, but were delivered to Plaintiff after the third trial day. (Tr. at 1062–1063). The Court admitted into evidence the photographs and other materials described in Dr. Bell's testimony for the jury to consider. Thus, the Court allowed Defendants ample opportunity to present to the jury its position that the initial change in reflectance in the Prestige meter was due mostly to a color change, and not to wetting, because the color change happens so quickly in the Prestige meter. Because the Court concludes that Defendants were permitted the opportunity to rebut Plaintiff's position that the change in reflectance was due to wetting, the Court concludes that Defendants were not prejudiced such that a new trial is warranted. *See Exxon Corp. v. Exxene Corp.*, 696 F.2d 544 (7th Cir.1982) (holding that new trial on grounds of unfair surprise not warranted where moving party had opportunity to rebut surprise testimony). Accordingly, the Court will deny Defendants' Motion For A Partial New Trial on the issue of unfair surprise.

### B. *The Court's Jury Instructions*

Defendants next contend that they are entitled to a new trial pursuant to Fed. R.Civ.P. 50(b)(1)(B) because several jury instructions were erroneous as a matter of

law. Specifically, Defendants challenge the last paragraph of the jury instruction relating to Defendants' burden of proof in light of the presumption of validity and the instructions defining "clear and convincing evidence."

### 1. Applicable law

 In determining whether a jury instruction was erroneous, the Court must "determine whether, taken as a whole, the [instructions] properly apprised the jury of the issues and the applicable law." *Tigg Corporation v. Dow Corning Corp.*, 962 F.2d 1119, 1123 (3d Cir.1992); *Mycogen Plant Science, Inc.*, 61 F.Supp.2d at 264. To this effect, "[t]he charge, taken as a whole and viewed in light of the evidence, must fairly and adequately submit the issues in the case to the jury." *Tigg Corp.*, 962 F.2d at 1123.

### 2. Whether the Court's jury instruction on Defendants' burden of proof in light of the presumption of validity was erroneous

 With regard to the jury instruction explaining Defendants' burden of proof in light of the presumption of validity, Defendants challenge the following paragraph:

> In deciding whether Defendants have met their burden of clear and convincing evidence, you must find that the witness's testimony in support of such evidence is credible. The facts to which they have testified must have been distinctly remembered, and the details of that testimony narrated exactly and in due order. Their testimony must have been clear, direct, and weighty so as to enable you to come to a clear conviction without hesitancy as to the truth of the precise facts in issue.

All evidence admitted during this trial, including documentary evidence, must also be considered.

(Tr. at 2743). Defendants contend that the effect of this paragraph was to "impermissibly heighten the burden of proof against them to proving invalidity beyond a reasonable doubt." (D.I. 445 at 40).

The Court disagrees with Defendants' argument. Several courts have considered the language of a similar jury instruction and have concluded that this language appropriately recites the burden of proof required by the clear and convincing standard. For example, in commenting on a similar instruction in the context of a contract dispute, the Fifth Circuit recognized that such an instruction recites "a fair and well supported definition" of what is required to prove something by clear and convincing evidence.[5] *In Aetna Insurance Co. v. Paddock*, 301 F.2d 807, 811 (5th Cir.1962) (citing *Philippine Sugar Estates Development Co. v. Government of Philippine Islands*, 247 U.S. 385, 38 S.Ct. 513, 62 L.Ed. 1177 (1918)); *see also United States of America v. Mastrangelo*, 561 F.Supp. 1114, 1120 (E.D.N.Y.1983) (approving of similar definition), *aff'd.*, 722 F.2d 13 (2d Cir.1983).

Likewise, in *Standard Havens Products, Inc. v. Gencor Indus. Inc.*, 1989 U.S.Dist. LEXIS 10333 (W.D.Mo. Aug. 30, 1989), the defendants in a patent and breach of contract action moved for a new trial on the grounds that the court's jury instructions on the clear and convincing standard and the presumption of validity improperly emphasized the defendant's burden of proof. Examining a series of instructions nearly identical to the instructions issued in this case, the court concluded that the charge was not erroneous, because it appropriate-

---

**5.** In *Aetna,* the Fifth Circuit cited with approval the following charge on clear and convincing evidence:

> [C]lear and convincing evidence [means that] the witness to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue.

*Aetna,* 301 F.2d at 811.

ly "advise[d] the jury on the clear and convincing evidence standard, the presumption of validity, and the relationship between the two concepts ... [which] are at the core of the statutory scheme of patent litigation." [6] *Id.* at *21–23. Because the Court's instruction was a correct definition of what is required to prove something by clear and convincing evidence, the Court concludes that the instruction could not have impermissibly heightened Defendants' burden of proof to the "beyond a reasonable doubt" standard. Accordingly, the Court will deny Defendants' Motion For A New Trial to the extent that it challenges this jury instruction.

3. Whether the Court's jury instructions defining "clear and convincing evidence" were erroneous

 Defendants next contend that the Court erred in adopting Plaintiff's proposed jury instructions defining clear and convincing evidence, because these instructions were confusing and provided a definition that was different from the definition set forth in the Uniform Jury Instructions. Defendants also contend that, taken together, these instructions improperly exaggerated Defendants' burden of proving invalidity by clear and convincing evidence.

In relevant part, the Court's instructions were as follows:

Clear and convincing evidence is evidence that produces an abiding convic-

tion that the truth of a factual contention is highly probable. Proof by clear and convincing evidence is thus a higher burden than proof by a preponderance of the evidence.

\* \* \* \* \* \*

To prove invalidity be clear and convincing evidence means that the Defendants must present evidence that produces in your minds a belief or conviction as to the matters sought to be established. This involves a greater degree of persuasion necessary than that to meet the preponderance of the evidence standard that LifeScan must meet to prove infringement. The presumption of validity is not overcome unless you are firmly convinced that Defendants presented clear and convincing evidence that dictates a contrary conclusion, and that the facts are indeed true in order to meet the clear and convincing burden of proof.

(Tr. at 2719–2720; 2742–2743). As recited above, the Court's charge includes, in the first paragraph, the definition provided by the Uniform Jury Instructions. Because Defendants' agree with the formulation set forth in the Uniform Jury Instructions, Defendants' argument necessarily focuses on the remaining portions of the instructions. However, reading the charge as a whole, the Court concludes that its instructions permissibly and appropriately expand on the definition provided by the

6. The jury instructions at issue in *Standard Havens* were as follows:

[C]lear and convincing evidence involves a greater persuasion than that which might satisfy a preponderance of the evidence standard. For purposes of evaluating the evidence introduced, clear and convincing evidence must product in your minds a firm belief or conviction as to the matters sought to be established. You must be firmly convinced that the fact is indeed true in order to meet the clear and convincing burden. [I]n deciding whether the defendant's have met their burden of clear and convincing evidence in attempting to overcome the presumption of patent validity, you must find that the witness' testimony in support of

such evidence is credible. The facts to which they have testified must have been distinctly remembered, and the details of that testimony narrated and in due order. Their testimony must have been clear, direct and weighty so as to enable you to come to a clear conviction as to the truth of the precise facts in issue. All evidence admitted during this trial, including documentary evidence must also be considered. The presumption of validity is not overcome unless you are clearly convinced that clear and convincing evidence dictates a contrary conclusion.

*Standard Havens*, 1989 U.S. Dist. LEXIS at *21–22.

Uniform Jury Instructions to provide an instruction more specific to a patent case. Further, the Court concludes that these instructions accurately set forth the law and are not confusing or contradictory as Defendants contend. *See Standard Haven,* 1989 U.S.Dist. LEXIS 10333 at 21–23 (examining similar instructions and rejecting defendant's argument that instructions were confusing and improperly emphasized burden of proof where instruction was neither confusing, nor contrary to law). Because the Court believes that its jury instructions were appropriate, the Court cannot conclude that they improperly exaggerated Defendants' burden of proof. Accordingly, the Court will deny Defendants' Motion For A New Trial to the extent that it challenges the Court's jury instructions.

## CONCLUSION

For the reasons discussed, Defendants' Motion For Judgment As A Matter of Law will be granted on the issue of infringement and denied on the issue of validity. In addition, Defendants' Motion For A Partial New Trial will be denied.

An appropriate Order will be entered.